## PEOPLE v FRAZIER

Docket No. 256986. Submitted October 19, 2005, at Detroit. Decided March 7, 2006, at 9:00 a.m. Leave to appeal sought.

Corey R. Frazier was convicted by a jury in the Genesee Circuit Court of various felonies, including two counts of felony murder. After pursuing unsuccessful appeals in the state appellate courts, the defendant filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of Michigan, which granted the writ after determining that the defendant's Sixth Amendment right to counsel was violated when his attorney abandoned him during police interrogations following arraignment. In pretrial proceedings for the defendant's new trial, the court, Robert M. Ransom, J., granted the defendant's motions to exclude from trial for any purpose evidence of postarraignment statements made by the defendant to the police while his attorney was not present and to exclude the testimony of prosecution witnesses who were identified from information in the defendant's inadmissible statements, unless the prosecution can establish that the discovery of those witnesses came from an independent source. The prosecution appealed by leave granted.

The Court of Appeals *held*:

1. The trial court correctly excluded from the prosecution's case-in-chief evidence of the defendant's postarraignment statement. The complete deprivation of the assistance of counsel at a critical stage of the adversarial proceedings amounts to structural error, and prejudice is presumed. The prosecution did not overcome the strong presumption that the defendant's subsequent waiver of his right to counsel was invalid. However, the trial court's exclusion of the postarraignment statements from use for impeachment purposes is unwarranted. Statements improperly elicited in violation of a defendant's Sixth Amendment right to counsel can be used to impeach the defendant's testimony at trial where, as here, the statements were voluntary.

2. The trial court improperly determined that the prosecution was precluded from introducing the testimony of the witnesses who were discovered during the improper postarraignment inter-

rogations, unless the prosecution could establish that it did, in fact, discover their identities from an independent source. The prosecution need only show that the identity of these witnesses would have inevitably been discovered through alternate means.

Affirmed in part, reversed in part, and remanded for further proceedings.

TALBOT, J., concurring in part and dissenting in part, agreed that the defendant's statements can be used as impeachment evidence at a new trial, but disagreed that the testimony of two witnesses discovered through the defendant's statements must be suppressed.

The testimony of the witnesses who were identified from the information in defendant's statements need not be excluded. The exclusionary rule should not apply under the facts in this case, and the inevitable discovery exception to the exclusionary rule should not apply where physical evidence is not at issue. Suppression of the testimony of the witnesses would do nothing to preserve the adversarial process and would place the police in a worse position than if the defendant's Sixth Amendment rights had not been violated. The disqualification of knowledgeable witnesses from testifying at trial would be a serious obstruction to the ascertainment of truth.

1. CRIMINAL LAW — EVIDENCE — RIGHT TO COUNSEL — VOLUNTARY STATEMENTS WITHOUT COUNSEL — IMPEACHMENT.

   Evidence of voluntary statements of a defendant who is represented by legal counsel made during police interrogation after arraignment and without counsel being present may not be used in the prosecution's case-in-chief at trial, but may be used for impeachment purposes in the event that the defendant waives the constitutional privilege against compelled self-incrimination by testifying in his or her own defense (US Const, Am V and Am VI).

2. CRIMINAL LAW — EVIDENCE — RIGHT TO COUNSEL — STATEMENTS WITHOUT COUNSEL — DERIVATIVE EVIDENCE.

   To introduce at trial against a defendant the testimony of witnesses discovered from information in statements obtained by the police from the defendant during an interrogation conducted in the absence of the defendant's legal counsel and in violation of the defendant's Sixth Amendment right to counsel, the prosecution need only show that the identity of the witnesses would have inevitably been discovered through alternate means (US Const, Am VI).

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, *Arthur A. Busch*, Prosecuting Attorney, and *Donald A. Kuebler*, Chief, Research, Training, and Appeals, for the people.

*Neil C. Szabo* for the defendant.

Before: COOPER, P.J., and TALBOT and FORT HOOD, JJ.

COOPER, P.J. The prosecution appeals, by leave granted, the July 28, 2004, order of the trial court granting defendant's pretrial motions to exclude certain evidence during his new trial. Specifically, the court prohibited the prosecution from using for impeachment purposes statements made by defendant should defendant waive his Fifth Amendment privilege and take the stand in his own defense. The United States District Court for the Eastern District of Michigan previously found that these statements were elicited in violation of defendant's Sixth Amendment right to counsel.[1] The trial court also prohibited the prosecution from presenting the testimony of two witnesses whose identity was procured from those inadmissible statements, absent a showing that these witnesses were, in fact, discovered from an independent source. We affirm in part and reverse in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 1996, defendant was convicted following a jury trial of two counts of felony murder,[2] two counts of possession of a firearm during the commission of a felony (felony-

---

[1] After defendant exhausted his state appellate relief, he successfully petitioned the federal district court for a writ of habeas corpus.

[2] MCL 750.316.

firearm),[3] and one count of armed robbery.[4] Defendant's convictions arose from the 1995 murders of James Goff and Aaron McColgan. Kenneth Haywood implicated defendant in the crime. Mr. Haywood told investigating officers that he drove defendant and codefendant, Idell Cleveland,[5] to Mr. McColgan's home on the night of the murders. Mr. Haywood waited in his car while defendant and Mr. Cleveland went inside. Through the open windows of the house, Mr. Haywood heard Mr. Cleveland say, "Get on the floor." Mr. Haywood then heard two gunshots, whereupon he fled the scene alone. He went to the police station the following day, after reading of the murders in a local newspaper.

Based on the information provided by Mr. Haywood, officers executed a search warrant at defendant's home three days after the murders. Thereafter, defendant's mother retained an attorney to represent her son. The attorney advised defendant to speak with the police in an attempt to negotiate a plea bargain, and accompanied his client when he surrendered to the authorities. Two days later, and following his arraignment, defendant gave three statements to the police detailing his involvement in the crime. Although initially denying any knowledge of Mr. Cleveland's plans, defendant ultimately admitted that he knew that Mr. Cleveland was armed and intended to rob Mr. Goff and Mr. McColgan.[6] Defendant also admitted that Mr. Cleveland

---

[3] MCL 750.227b.

[4] MCL 750.529.

[5] This Court affirmed Mr. Cleveland's convictions of two counts of first-degree murder, MCL 750.316; two counts of felony-firearm, MCL 750.227b; and one count of armed robbery, MCL 750.529. *People v Cleveland*, unpublished opinion of the Court of Appeals, issued June 17, 1997 (Docket No. 194236).

[6] A panel of this Court previously indicated that "defendant admitted that he supplied codefendant with the murder weapon and knew of

gave him two $50 bills following the robbery. Defendant told officers that two men operating a street sweeper gave him a ride home following the shootings. The prosecution located these witnesses, Anthony Wright and Wilbert Mack, who testified that defendant indicated that he had been at a party and could not find a ride home. They further testified that defendant asked them if they had change for a $50 bill.

In his first appeal, defendant alleged that counsel was ineffective for advising him to speak to the police absent an official offer to enter into a plea agreement. This Court originally affirmed defendant's convictions.[7] Upon receiving information from the defendant that the challenged interrogations occurred following arraignment, however, the panel reconsidered and remanded for a *Ginther*[8] hearing.[9] At that hearing, defense counsel testified that he remained with defendant while he waived his *Miranda*[10] rights and agreed to speak with the police. However, counsel admitted that he did not accompany his client into the interrogations, as he was uncertain whether the officers would have

codefendant's intent to rob the victims." *People v Frazier (After Remand)*, unpublished opinion of the Court of Appeals, issued April 21, 2000 (Docket No. 193891) (*Frazier III*), slip op at 6 n 2. This description of defendant's statement is inaccurate. Defendant stated that he knew that Mr. Cleveland intended to rob Mr. Goff and Mr. McColgan "when he told me to get his gun." Defendant never indicated that he provided the murder weapon.

[7] *People v Frazier*, unpublished opinion of the Court of Appeals, issued February 27, 1998 (Docket No. 193891) (*Frazier I*) (vacated by an order entered May 6, 1998).

[8] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[9] *People v Frazier (On Rehearing)*, unpublished opinion of the Court of the Appeals, issued August 7, 1998 (Docket No. 193891) (*Frazier II*). The panel also vacated defendant's conviction of armed robbery on double jeopardy grounds.

[10] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

allowed him to be present. Despite counsel's abandonment of his client, the trial court denied defendant's motion for a new trial and this Court affirmed.[11] Defendant then filed an application for leave to appeal with the Michigan Supreme Court, which was denied.[12]

The defendant subsequently filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of Michigan. Defendant alleged for the first time in that petition that defense counsel's abandonment during the police interrogations violated his Sixth Amendment right to counsel under *United States v Cronic*.[13] The federal district court agreed and granted defendant's writ.[14] The district court found that defendant was completely deprived of the assistance of counsel during a critical stage of the proceedings—the police interrogations following his arraignment.[15] Accordingly, the district court found:

> The absence of counsel during the interrogations tainted the whole trial process, as evidenced by the use of Petitioner's statements at trial. Allowing the State to retry Petitioner with the use of the statements made during the tainted interrogations would lead only to yet another tainted trial. Therefore, the only appropriate remedy is to not allow use of the tainted statements, should the State decide to initiate a new trial in this matter.[16]

---

[11] *Frazier III, supra.* The panel focused solely on counsel's strategic decision to seek a plea bargain for his client.

[12] *People v Frazier*, 464 Mich 851 (2001) (*Frazier IV*) (KELLY and CAVANAGH, JJ., dissenting).

[13] *United States v Cronic*, 466 US 648; 104 S Ct 2039; 80 L Ed 2d 657 (1984).

[14] *Frazier v Berghius*, unpublished opinion of the United States District Court for the Eastern District of Michigan, issued August 6, 2003 (Docket No. 02-CV-71741-DT) (*Frazier V*).

[15] *Id.* at 12-13.

[16] *Id.* at 13-14.

Thereafter, the prosecution re-arraigned defendant in November of 2003.[17] Prior to trial, defendant filed a motion to prevent the prosecution from making *any* use of his statements to the police, even for impeachment purposes. Defendant also sought to prevent the prosecution from introducing the testimony of Mr. Wright and Mr. Mack, as knowledge of their identity was only procured from defendant's inadmissible statements. The trial court excluded both the statements and any evidence derived therefrom.[18] Based solely on the federal district court's order, the trial court determined that allowing the prosecution to use the statements for impeachment purposes would taint defendant's retrial. The trial court also granted defendant's motion to exclude the testimony of Mr. Mack and Mr. Wright as "fruits" of those improper statements. The court noted, however, that these witnesses could be called at trial, "if the People can provide a foundation that the discovery of these witnesses came from a different source." This Court subsequently granted the prosecution's motion for leave to appeal.[19]

## II. IMPEACHMENT

The prosecution first contends that the trial court improperly excluded the use of defendant's statements for impeachment purposes in the event that defendant waives his Fifth Amendment privilege against self-incrimination and takes the stand in his own defense.

---

[17] In the current trial, the prosecution charged defendant with two counts of open murder (rather than felony murder), MCL 750.316; two counts of felony-firearm, MCL 750.227b; and one count of armed robbery, MCL 750.529.

[18] The trial court also ruled upon several pretrial, evidentiary motions that are not at issue in this appeal.

[19] *People v Frazier*, unpublished order of the Court of Appeals, entered July 30, 2004 (Docket No. 256986).

We review a trial court's decision to admit or exclude evidence for an abuse of discretion.[20] However, when the trial court's decision involves a preliminary question of law, we review the issue de novo.[21]

We agree with the federal district court's determination that the prosecution is prohibited from using defendant's statements elicited during the post-arraignment interrogations in its case-in-chief. "The Sixth Amendment provides that the accused in a criminal prosecution 'shall enjoy the right . . . to have the Assistance of counsel for his defence.' "[22] The accused is guaranteed "the right to rely on counsel as a 'medium' between him and the State."[23] This right attaches once formal adversary proceedings are initiated against the defendant, such as at arraignment.[24] Generally, a defendant who alleges that he was denied the effective assistance of counsel must establish that counsel's errors affected the outcome of his trial.[25] However, the complete deprivation of the assistance of counsel at a critical stage of the adversary proceedings amounts to structural error, and, therefore, prejudice is presumed.[26] The United States Supreme Court has

[20] *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999).

[21] *Id.*

[22] *People v Russell*, 471 Mich 182, 187; 684 NW2d 745 (2004), quoting US Const, Am VI. See also Const 1963, art 1, § 20 (a criminal defendant "shall have the right . . . to have the assistance of counsel for his . . . defense").

[23] *Maine v Moulton*, 474 US 159, 176; 106 S Ct 477; 88 L Ed 2d 481 (1985).

[24] *Michigan v Jackson*, 475 US 625, 629-630; 106 S Ct 1404; 89 L Ed 2d 631 (1986); *Kirby v Illinois*, 406 US 682, 689; 92 S Ct 1877; 32 L Ed 2d 411 (1972).

[25] *Strickland v Washington*, 466 US 668, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

[26] *Cronic, supra* at 659; *People v Willing*, 267 Mich App 208, 224; 704 NW2d 472 (2005), citing *Russell, supra* at 194 n 29, and *People v Anderson (After Remand)*, 446 Mich 392, 405; 521 NW2d 538 (1994).

repeatedly found that post-arraignment police interrogations are a critical stage of criminal proceedings at which a defendant is entitled to legal representation.[27] Yet, defense counsel, in this case, purposefully and unreasonably left his client to face the police interrogations alone. The prosecution did not overcome the strong presumption that defendant's subsequent waiver of his right to counsel was invalid. Accordingly, the prosecution clearly may not use defendant's statements in its case-in-chief.[28]

While the United States Supreme Court has repeatedly excluded statements elicited in violation of a defendant's constitutional rights from the prosecution's case-in-chief, such statements, if otherwise voluntary, are admissible for impeachment purposes. In *Walder v United States*,[29] the Supreme Court found that the prosecution may not rely on evidence seized in violation of the Fourth Amendment to establish a defendant's guilt. Yet, the Court found no reason to exclude such evidence for impeachment purposes.

> It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession

---

[27] *Jackson, supra* at 629-630; *Brewer v Williams*, 430 US 387, 400-401; 97 S Ct 1232; 51 L Ed 2d 424 (1977), citing *Massiah v United States*, 377 US 201; 84 S Ct 1199; 12 L Ed 2d 246 (1964).

[28] See *Michigan v Harvey*, 494 US 344, 349; 110 S Ct 1176; 108 L Ed 2d 293 (1990), citing *Jackson, supra* ("[O]nce a criminal defendant invokes his Sixth Amendment right to counsel, a subsequent waiver of that right—even if voluntary, knowing, and intelligent under traditional standards—is presumed invalid if secured pursuant to police-initiated conversation," and may not be admitted as substantive evidence in the prosecutor's case-in-chief.).

[29] *Walder v United States*, 347 US 62, 64-65; 74 S Ct 354; 98 L Ed 503 (1954).

was obtained to his own advantage, and provide himself
with a shield against contradiction of his untruths. . . .

. . . Of course, the Constitution guarantees a defendant
the fullest opportunity to meet the accusation against him.
He must be free to deny all the elements of the case against
him without thereby giving leave to the Government to
introduce by way of rebuttal evidence illegally secured by
it, and therefore not available for its case in chief. Beyond
that, however, there is hardly justification for letting the
defendant affirmatively resort to perjurious testimony in
reliance on the Government's disability to challenge his
credibility.[30]

The United States Supreme Court has similarly found
that statements improperly elicited during a custodial
interrogation after a defendant invokes the right to
counsel may be used for impeachment purposes.[31]

Every criminal defendant is privileged to testify in his
own defense, or to refuse to do so. But that privilege cannot
be construed to include the right to commit perjury. . . .
Having voluntarily taken the stand, petitioner was under
an obligation to speak truthfully and accurately, and the
prosecution here did no more than utilize the traditional
truth-testing devices of the adversary process. . . .

The shield provided by *Miranda* cannot be perverted
into a license to use perjury by way of a defense, free from
the risk of confrontation with prior inconsistent utter-
ances.[32]

---

[30] *Id.* at 65.

[31] *Oregon v Hass*, 420 US 714; 95 S Ct 1215; 43 L Ed 2d 570 (1975);
*Harris v New York*, 401 US 222; 91 S Ct 643; 28 L Ed 2d 1 (1971). We
note that previous opinions of the Supreme Court appeared to
consider *Miranda* to be merely a "prophylactic" protection of a
defendant's Fifth Amendment rights. The Supreme Court has since
made clear that the protections in *Miranda* are themselves constitu-
tionally based. *Dickerson v United States*, 530 US 428; 120 S Ct 2326;
147 L Ed 2d 405 (2000).

[32] *Harris, supra* at 225-226.

More recently, in *Michigan v Harvey*,[33] the United States Supreme Court specifically determined that statements improperly elicited in violation of a defendant's Sixth Amendment right to counsel could be used to impeach his or her testimony on the stand. The Court acknowledged that, as waivers of a defendant's Sixth Amendment right to counsel are presumptively invalid, evidence obtained following such a waiver is inadmissible to establish a defendant's guilt.[34] "The prosecution must not be allowed to build its case against a criminal defendant with evidence acquired in contravention of constitutional guarantees and their corresponding judicially created protections. But use of statements so obtained for impeachment purposes is a different matter."[35] The Court reasoned that the exclusion of "reliable and probative evidence for *all* purposes" was only necessary when "derived from *involuntary* statements."[36]

Nothing on the record suggests that defendant's statements during these post-arraignment interrogations were involuntary. This Court has found that "[a] confession is involuntary if obtained by any sort of threat or violence, by any promises, express or implied, or by the exertion of any improper influence."[37] The

---

[33] *Harvey, supra.*

[34] *Id.* at 349.

[35] *Id.* at 351.

[36] *Id.*, citing *New Jersey v Portash*, 440 US 450, 459; 99 S Ct 1292; 59 L Ed 2d 501 (1979). See also *People v Stacy*, 193 Mich App 19, 24-25; 484 NW2d 675 (1992), quoting *People v Paintman*, 139 Mich App 161, 169-170; 361 NW2d 755 (1984) (" '[S]tatements taken in violation of a defendant's right to counsel, if voluntary, may be used for impeachment purposes although they could not have been used in the prosecutor's case-in-chief.' ").

[37] *Paintman, supra* at 171, citing *Malloy v Hogan*, 378 US 1, 7; 84 S Ct 1489; 12 L Ed 2d 653 (1964).

United States Supreme Court has further found "that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause . . . ."[38] Defendant was advised of his *Miranda* rights in the presence of counsel and signed a waiver form. Defendant does not contend, nor is there any indication on the record, that any police officer intimidated, coerced, or used any other improper method to secure defendant's statements.[39] Neither the caselaw of this state,[40] nor that from the United States Supreme Court, requires the total exclusion of otherwise voluntary statements elicited in violation of a defendant's Sixth Amendment right to counsel. The exclusion of these statements for impeachment purposes was unwarranted under these circumstances. Accordingly, we reverse that part of the trial court's order granting defendant's motion on this ground.

### III. DERIVATIVE EVIDENCE

The trial court also determined that the prosecution was precluded from introducing the testimony of Mr.

---

[38] *Colorado v Connelly*, 479 US 157, 167; 107 S Ct 515; 93 L Ed 2d 473 (1986).

[39] See *Frazier II*, *supra* at 4-5. The panel in that case found that a detective mistakenly informed defendant that any statements made during his polygraph examination would be inadmissible in court. However, officers corrected that error prior to administering the exam. *Id.* at 5.

[40] We note that, prior to *Michigan v Harvey*, the Michigan Supreme Court had not made a definitive decision whether the prosecution could impeach a defendant with his prior inconsistent statements elicited in violation of his right to counsel. See *People v Esters*, 417 Mich 34; 331 NW2d 211 (1982) (in which three justices found that such statements could be used for impeachment purposes, while three others would prohibit the use of the statements for any purpose). See also *People v Gonyea*, 421 Mich 462; 365 NW2d 136 (1984) (the justices reached a similar three-three split, with Justice CAVANAGH finding that the statement was inadmissible for any purpose under the facts of that case alone).

Mack and of Mr. Wright, as their identities were discovered during the improper post-arraignment interrogations. However, the court ruled that the prosecution could present these witnesses if it could establish that it did, *in fact*, discover their identities from an independent source. Rather than making that determination during the motion hearing, the trial court left the prosecution to its proofs. We agree that the prosecution must make an affirmative showing to support the admission of this evidence prior to calling these witnesses. Yet, we do not agree that the prosecution must show that it *actually* discovered these witnesses through independent, legal means. Rather, the prosecution need only show that the identity of these witnesses would have inevitably been discovered through alternate means.[41]

The rule that the tainted "fruit" of unlawful government conduct must be suppressed began with the United States Supreme Court's opinion in *Silverthorne Lumber Co v United States*.[42] The exclusionary rule originally applied to tangible evidence obtained in violation of the Fourth Amendment and any incriminating evidence derived therefrom.[43] In *Wong Sun v United States*, the Supreme Court extended the rule to further exclude indirect evidence derived from an illegal search.[44] From the genesis of the exclusionary rule, however, there were exceptions. Illegally obtained evidence does not "become sacred and inaccessible"; rather, these facts, if discovered by independent means,

---

[41] We further believe that the trial court must make this determination at a separate hearing outside the presence of the jury.

[42] *Silverthorne Lumber Co v United States*, 251 US 385; 40 S Ct 182; 64 L Ed 319 (1920).

[43] *Id.* at 392.

[44] *Wong Sun v United States*, 371 US 471, 484-485; 83 S Ct 407; 9 L Ed 2d 441 (1963).

can be placed before the jury as substantive evidence.[45] In *Wong Sun*, the Court noted the lessened need for exclusion when the connection between the illegally seized evidence and the underlying impropriety was attenuated.

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."[46]

This exception to the exclusionary rule is known as the "independent source doctrine."

The United States Supreme Court has not limited the application of the exclusionary rule, or its exceptions, to violations of a defendant's Fourth Amendment right to be free from illegal searches and seizures. The Court has since applied the rule to violations of a defendant's Sixth Amendment right to counsel[47] and Fifth Amendment privilege against self-incrimination.[48]

---

[45] *Silverthorne, supra* at 392. See also *United States v Ceccolini*, 435 US 268, 274; 98 S Ct 1054; 55 L Ed 2d 268 (1978), quoting *Nardone v United States*, 308 US 338, 341; 60 S Ct 266; 84 L Ed 2d 307 (1939).

[46] *Wong Sun, supra* at 487-488, quoting Maguire, Evidence of Guilt, 221 (1959).

[47] See *United States v Wade*, 388 US 218, 227, 240-241; 87 S Ct 1926; 18 L Ed 2d 1149 (1967) (holding that an identification based upon a pretrial lineup, conducted without the benefit of counsel, must be suppressed unless the prosecution can establish that a witness's in-court identification was based upon independent observations).

[48] See *Kastigar v United States*, 406 US 441, 460-461; 92 S Ct 1653; 32 L Ed 2d 212 (1972) (holding that evidence obtained in violation of a defendant's Fifth Amendment privilege against self-incrimination must be suppressed unless the prosecution can establish that it "had an

In *Michigan v Tucker*,[49] however, the Supreme Court declined to extend the exclusionary rule to statements procured in violation of a defendant's right to counsel during a custodial interrogation. In *Tucker*, the defendant was advised that he had the right to counsel during his custodial interrogation, but was not advised that counsel could be appointed.[50] The Court found that the defendant voluntarily spoke with the police, regardless of the imperfect instruction of rights.[51] During the interrogation, the defendant named an alibi witness, who ultimately further incriminated the defendant.[52] The Court found the exclusionary rule of *Wong Sun* inapplicable in cases involving a violation of *Miranda's* "prophylactic" protection of a defendant's Fifth Amendment rights.[53] The Court did exclude the defendant's statements from the prosecution's case-in-chief, however, the Court determined that, where officers act in good faith, the exclusion of illegally obtained evidence would not deter future misconduct.[54] The Court further declined to exclude the testimony of the defendant's "alibi" witness, as that witness was not subjected to "custodial pressures."[55] Accordingly, the Court found

independent, legitimate source for the disputed evidence"). See also *Murphy v Waterfront Comm of New York Harbor*, 378 US 52, 79; 84 S Ct 1594; 12 L Ed 2d 678 (1964), overruled in part on other grounds *United States v Balsys*, 524 US 666; 118 S Ct 2218; 141 L Ed 2d 575 (1998).

[49] *Michigan v Tucker*, 417 US 433; 94 S Ct 2357; 41 L Ed 2d 182 (1974).

[50] *Id.* at 435. Defendant was arrested and interrogated before the United States Supreme Court issued its opinion in *Miranda v Arizona*. However, his trial occurred after that decision.

[51] *Id.* at 450.

[52] *Id.* at 436-437.

[53] *Id.* at 444. The Court has not extended the exclusionary rule to such situations since rendering its opinion in *Dickerson, supra*.

[54] *Tucker, supra* at 447-448.

[55] *Id.* at 449.

that his independent testimony was trustworthy and therefore admissible against the defendant.[56]

*Tucker* is inapplicable in this case, however, as defendant was clearly deprived of his Sixth Amendment right to counsel following the initiation of formal adversary proceedings. Therefore, pursuant to *Silverthorne* and *Wong Sun*, the prosecution may not present the testimony of Mr. Mack and Mr. Wright absent an exception to the exclusionary rule. While the prosecution is not required to show that it did, *in fact*, discover these witnesses through independent means, the prosecution must show that their independent discovery was inevitable.

In *United States v Ceccolini*, the Supreme Court noted that it would invoke the exclusionary rule "with much greater reluctance" where the illegally obtained, derivative evidence was live testimony.[57] The Court did not name the doctrine upon which it relied. However, the Court reasoned that live witnesses are more likely to be inevitably discovered by alternate, legal means.

> The greater the willingness of the witness to freely testify, the greater the likelihood that he or she will be discovered by legal means . . . . Witnesses can, and often do, come forward and offer evidence entirely of their own volition. And evaluated properly, the degree of free will necessary to dissipate the taint will very likely be found more often in the case of live-witness testimony than other kinds of evidence. The time, place and manner of the initial questioning of the witness may be such that any statements are truly the product of detached reflection and a desire to be cooperative on the part of the witness. And the illegality which led to the discovery of the witness very often will not play any meaningful part in the witness' willingness to testify.[58]

---

[56] *Id.*

[57] *Ceccolini, supra* at 280.

[58] *Id.* at 276-277.

In *Nix v Williams*,[59] the Court specifically extended
the "inevitable discovery doctrine" as an exception to
the exclusionary rule. In *Nix*, officers elicited informa-
tion from the defendant in the absence of counsel while
being transported to another jurisdiction. The informa-
tion concerned the location of his victim's body. Without
defendant's statement, the body would have been dis-
covered through independent search efforts within
three to five hours.[60] The Court found that the exclusion
of illegally obtained evidence should not place the
government in a worse position than if counsel had
been present during the interrogation.[61]

> Exclusion of physical evidence that would inevitably
> have been discovered adds nothing to either the integrity
> or fairness of a criminal trial. The Sixth Amendment right
> to counsel protects against unfairness by preserving the
> adversary process in which the reliability of proffered
> evidence may be tested in cross-examination. . . .
>
> Nor would suppression ensure fairness on the theory
> that it tends to safeguard the adversary system of justice.
> To assure the fairness of trial proceedings, this Court has
> held that assistance of counsel must be available at pretrial
> confrontations where "the subsequent trial [cannot] cure
> [an otherwise] one-sided confrontation between prosecut-
> ing authorities and the uncounseled defendant." Fairness
> can be assured by placing the State and the accused in the
> same positions they would have been in had the impermis-
> sible conduct not taken place. However, if the government
> can prove that the evidence would have been obtained
> inevitably and, therefore, would have been admitted re-
> gardless of any overreaching by the police, there is no
> rational basis to keep that evidence from the jury in order
> to ensure the fairness of the trial proceedings. In that
> situation, the State has gained no advantage at trial and

---

[59] *Nix v Williams*, 467 US 431; 104 S Ct 2501; 81 L Ed 2d 377 (1984).

[60] *Id.* at 448-449.

[61] *Id.* at 444.

the defendant has suffered no prejudice. Indeed, suppression of the evidence would operate to undermine the adversary system by putting the State in a *worse* position than it would have occupied without any police misconduct. . . .[62]

The United States Supreme Court recently granted certiorari in *Hudson v Michigan*[63] to consider whether evidence discovered during an illegal search following a violation of the knock-and-announce rule could be otherwise admissible under the inevitable discovery doctrine. While both this case and *Nix* involved a violation of a defendant's Sixth Amendment right to counsel, the inevitable discovery doctrine has its roots in Fourth Amendment jurisprudence.[64] Therefore, the Court's decision in *Hudson* could potentially have a more far-reaching effect. However, at this time, we remain bound by *Nix* to apply the inevitable discovery doctrine.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

FORT HOOD, J., concurred.

TALBOT, J. *(concurring in part and dissenting in part).* This case involves two issues: whether the prosecution can use defendant's suppressed statement as impeachment evidence in the event of a new trial and whether the prosecution can present the testimony of Wilbert Mack and Anthony Wright, witnesses who were refer-

---

[62] *Id.* at 446-447 (internal citations omitted).

[63] *Hudson v Michigan,* ___ US ___; 125 S Ct 2964; 162 L Ed 2d 886 (2005).

[64] See *Fitzpatrick v New York,* 414 US 1050, 1051; 94 S Ct 554; 38 L Ed 2d 338 (1973) (dissent by White, J.) (questioning the wisdom of extending the independent source doctrine to "hypothetical," that is, "inevitable," discoveries incident to an illegal search).

enced by defendant in his statement to the police. I concur that defendant's statements can be used as impeachment evidence at a new trial, but dissent from the majority's conclusion that the derivative evidence must be suppressed.

In 1995, defendant made several statements to the police. He told the police that he was present at the murder scene, but fled and got a ride home with "Will," one of two "street cleaners" whom he met at the Speedy-Q gas station. Defendant also admitted to the police that he knew that Idell Cleveland, his accomplice, "was going to rob them when he told me to get his gun," and that after the shooting, Cleveland gave him two $50 bills.

The background of this case is somewhat unusual. It reaches us following a federal district court determination that a writ of habeas corpus be granted under the Antiterrorism and Effective Death Penalty Act, 28 USC 2254(d)(1), because counsel was ineffective under the Sixth Amendment, and that the prosecution was prohibited from using defendant's statements in its case-in-chief. The federal district court found that the state court unreasonably analyzed the issues in this case under *Strickland v Washington,* 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984), rather than *United States v Cronic,* 466 US 648, 659; 104 S Ct 2039; 80 L Ed 2d 657 (1984).[1] The federal district court concluded that

---

[1] In fact, contrary to the reasoning of the federal district court, *Cronic*—decided the same day as *Strickland*—does not represent a separate standard; rather, it provides an explanation of specific circumstances that are "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Cronic,* 466 US 658. The presumed prejudice in *Cronic* is based on the premise that the attorney's failure to "subject the prosecution's case to meaningful adversarial testing" was complete. *Bell v Cone,* 535 US 685, 696-697; 122 S Ct 1843; 152 L Ed 2d 914 (2002). I see no evidence of that occurring here.

the "absence of counsel during the interrogation tainted the whole trial process, as evidenced by the use of [defendant's] statements at trial." Under *Cronic,* the federal district court concluded, prejudice was presumed. The prosecutor apparently did not appeal that decision. Given this uncertain foundation, and the jumble of underlying issues, I question the value of a published decision in the case before us. Although this matter touches on questions of first impression, the sui generis nature of the facts limits the application of any ruling here, and I would caution that this opinion not be construed more broadly than the issues require.

The primary purpose of the exclusionary rule is to deter police misconduct, *Michigan v Tucker,* 417 US 433, 446; 94 S Ct 2357; 41 L Ed 2d 182 (1974). The exclusionary rule, a judicially created doctrine, " 'is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.' " *Id.,* 417 US 446 (quoting *Elkins v United States,* 364 US 206, 217; 80 S Ct 1437; 4 L Ed 2d 1669 [1960]). "Despite the broad deterrent purpose of the exclusionary rule, it has never been interpreted to proscribe the introduction of illegally seized evidence in all proceedings or against all persons . . . ." *Stone v Powell,* 428 US 465, 486; 96 S Ct 3037; 49 L Ed 2d 1067 (1976). "In sum, the rule is a judicially created remedy designed to safeguard the Fourth Amendment generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *United States v Calandra,* 414 US 338, 348; 94 S Ct 613; 38 L Ed 2d 561 (1974). "[A]pplication of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served." *Id.*

As the majority acknowledges, police misconduct is not alleged in this case. There was no violation of defendant's *Miranda* rights,[2] *Dickerson v United States,* 530 US 428; 120 S Ct 2326; 147 L Ed 2d 405 (2000), no "knowledge gained by the Government's own wrong" that must be suppressed, *Wong Sun v United States,* 371 US 471, 485; 83 S Ct 407; 9 L Ed 2d 441 (1963), and no deterrent purpose to be served by excluding the testimony of Mr. Mack and Mr. Wright.

In cases involving a violation of the Sixth Amendment right to counsel, exclusion of physical evidence is sometimes warranted to preserve "the adversary process in which the reliability of proffered evidence may be tested in cross-examination." *Nix v Williams,* 467 US 431, 446; 104 S Ct 2501; 81 L Ed 2d 377 (1984). The adversary system is undermined, however, if the suppression of evidence puts the state in a worse position that it would have occupied without any misconduct. *Id.,* 467 US 447.

In the case before us, the majority volunteers that it agrees with the federal district court that defendant was "abandoned" by his attorney and denied his Sixth Amendment right to the effective assistance of counsel. That issue is not before us but, in light of the majority's pronouncement, I note that I am not at all sure that the federal district court decision, which was based on arguments never raised by defendant in the state courts, is correct. The Antiterrorism and Effective Death Penalty Act was intended to "ensure that state-court convictions are given effect to the extent possible under law" and to provide habeas corpus relief when a state court decision is objectively unreasonable, but not where its application of federal law is merely erroneous

---

[2] *Miranda v Arizona,* 384 US 436, 479; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

or incorrect. *Bell v Cone*, 535 US 685, 693-694; 122 S Ct 1843; 152 L Ed 2d 914 (2002). Although I see no evidence that the state court action in this case rose to the level of being "objectively unreasonable," I concede that we are bound by the unchallenged federal district court determination. For that reason, I concur with the majority's conclusion on the first issue, that defendant's voluntary statements to the police, even when obtained in violation of the Sixth Amendment right to counsel, may be used for impeachment purposes. See *Michigan v Harvey*, 494 US 344; 110 S Ct 1176; 108 L Ed 2d 293 (1990).

As for the second issue, however, the federal district court did not find, and I am not willing to concede, that the presumed prejudice in *Cronic* applies to the testimony of Mr. Mack and Mr. Wright. I see no reason to compound the problems in this case by further extending the judicially created exclusionary rule in a situation in which there was no government misconduct and no damage to the adversary process. Although the result of the majority decision would likely be negligible here, where the challenged evidence is of little moment, it creates an extension that could be devastating in future cases. Further, even if the exclusionary rule were relevant here, remand would not be warranted. It is all but certain that defendant would have made reference to the "street cleaners" even if he had been represented by counsel, and that, even without defendant's statement, the witnesses would have been discovered in the course of a competent police investigation. And so I dissent from the remainder of the majority opinion.

As this Court recognized in a previous review of this matter, "If defendant's statements to the police had comported with his statements to counsel, he would not have inculpated himself in the crime. Rather he would

have admitted that he was merely present while [another person] robbed and murdered the victims." *People v Frazier (After Remand)*, unpublished opinion per curiam of the Court of Appeals, issued April 21, 2000 (Docket No. 193891), slip op, p 5. There is every reason to believe that defendant would have made his initial statement to the police even if counsel had accompanied him to the interview.

Even after trial, at the *Ginther*[3] hearing, defendant never denied being at the murder scene, he only argued that he was merely present. Before defendant spoke to the police, they were already aware that Kenneth Haywood had driven defendant and Idell Cleveland to the murder scene and that Haywood abandoned defendant there so that he had to find another way home.[4] According to defendant's trial counsel, defendant insisted that he wanted to give a truthful statement to the police in an effort to secure a plea bargain. Counsel said that he told defendant not to talk to the police, but that defendant maintained his innocence and wanted to "get his story out." Counsel testified that he advised defendant of the risks of talking to the police and said that "what he was telling me had to be the truth if he was going to be talking, in order to pursue a plea bargain." Defendant told counsel that he was not involved in the murders and that "he had no knowledge of the armed robbery, or of the robbery that was going to be occurring." Counsel explained defendant's "options" to him and advised him that "as long as he was honest and

[3] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[4] Haywood testified at trial that Cleveland promised to give him $20 in exchange for a ride. Haywood testified that he drove Cleveland and defendant to a house and saw them go inside, that he heard Cleveland say, "Get on the floor," that he heard gunshots, and that he became frightened and drove away without waiting for Cleveland or defendant to return to the car.

truthful," he could pursue a plea bargain with the police. Defendant was advised by the police of his rights, he chose to make statements, and those statements have been determined, on numerous occasions, to have been voluntary.

Because part of defendant's "story," even after he was convicted of the crimes, was that he was present at the murder scene and had to find a ride home, I believe that the challenge to the essentially neutral testimony of Mr. Mack and Mr. Wright is much ado about nothing.[5] The record contains every assurance that, even if counsel had gone with defendant to the interview, defendant would have told the police that he was merely present and that he found a ride home with street cleaners after he fled the scene.

There appears to be no law precisely on point with this case and it is clear that the labyrinth of federal law can be read to support virtually any conclusion. The majority suggests that the cure for the alleged Sixth Amendment violation here is to apply the inevitable discovery exception to the exclusionary rule under *Nix,* 467 US 446. I believe this is an unwarranted extension of the doctrine, and I see no good reason to create a prophylactic rule to protect defendants who lie to their attorneys and then get into trouble by telling the police more of the truth than they intended. Nor do I agree

---

[5] Mr. Mack and Mr. Wright did not know defendant. Because defendant did not dispute that he was present at the scene and had to find a ride home, the only damaging part of Mr. Mack's and Mr. Wright's testimony was that defendant asked them if they had "change for a 50." Neither witness ever saw any money in defendant's possession, but there was other evidence regarding a stack of money, with a $50 bill on top, at the scene before the shootings. As noted previously, defendant also told the police that accomplice Cleveland gave him two $50 bills after the shootings, but that statement would not be presented as substantive evidence at a new trial and is not relevant to this discussion.

that *Nix* governs the result in this case. As the majority explains, *Nix* involved a defendant who, in the absence of counsel, told the police—who had promised not to question him—where to find the body of the murdered child. The evidence of the child's body was deemed admissible because its discovery was inevitable. *Nix*, 467 US 449-450. In my view, the doctrine of inevitable discovery simply does not apply on the facts of this case, where physical evidence is not at issue. "[I]nevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment," *id.*, 467 US 444 n 5, while this case is rife with speculation.

Although the majority correctly notes that neither case is precisely on point, I believe that this case is far more like *Tucker* than it is like *Nix*, and that the exclusionary rule does not apply. The *Tucker* case involved a pre-*Miranda* interrogation and, while the defendant was asked if he wanted counsel, he was not advised that an attorney would be appointed if he could not afford one. *Tucker*, 417 US 435. Although the defendant in *Tucker* was interrogated before the decision in *Miranda*, his trial took place afterward, so the rule in *Miranda* applied. The defendant's statements themselves were excluded at trial, and the question on appeal was whether testimonial evidence derived from the interrogation needed to be excluded. *Tucker*, 417 US 437-439. The testimony at issue was that of a third party named by defendant as an alibi witness and, because the defendant's statements were voluntary and because the police conduct was a departure from later-enacted "prophylactic standards" rather than actual misconduct, the testimony was deemed admissible. The Court emphasized that no particular pressure was placed on the defendant to make the statement and that "the evidence which the prosecution successfully

sought to introduce was not a confession of guilt by respondent, or indeed even an exculpatory statement by respondent, but rather the testimony of a third party who was subjected to no custodial pressures." *Id.*, 417 US 449. Noting that "[h]ere we deal, not with the offer of respondent's own statements in evidence, but only with the testimony of a witness whom the police discovered as a result of respondent's statements," the Supreme Court reasoned that "the reliability of [the] testimony was subject to the normal testing process of an adversary system." *Id.* While *Tucker* was argued under Fifth Amendment principles, the Court concluded that "recourse to respondent's voluntary statements does no violence to such elements of the adversary system as may be embodied in the Fifth, Sixth, and Fourteenth Amendments." *Id.*, 417 US 450.

I do not believe that there can be a "bright line" rule of exclusion when it comes to living witnesses, and I am certain that this is neither the proper case nor the proper place to fashion such a rule. As the majority acknowledges, living witnesses are " 'not to be mechanically equated with the proffer of inanimate evidentiary objects illegally seized.' " *United States v Ceccolini*, 435 US 268, 277; 98 S Ct 1054; 55 L Ed 2d 268 (1978), quoting *Smith v United States*, 117 US App DC 1, 3-4; 324 F2d 879 (1963). "The fact that the name of a potential witness is disclosed to police is of no evidentiary significance, *per se*, since the living witness is an individual human personality whose attributes of will, perception memory and volition interact to determine what testimony he will give." *Ceccolini*, 435 US 277. "The time, place and manner of the initial questioning of the witness may be such that any statements are truly the product of detached reflection and a desire to be cooperative on the part of the witness. And the

illegality which led to the discovery of the witness very often will not play any meaningful part in the witness' willingness to testify." *Id.*

The "Sixth Amendment guarantees that the conviction of the accused will be the product of an adversarial process," *Nix,* 467 US 453 (Stevens, J., concurring). There was no *Miranda* violation in this case, no police misconduct, no claim of witness bias, no challenge to the "reliability of [the] proffered evidence," *id.,* 467 US 446, and nothing in the record to suggest that the adversarial process would be tainted by the testimony of Mr. Mack and Mr. Wright. This case does not involve physical evidence that could only have been discovered as a result of defendant's uncounseled statements. As in *Tucker,* the challenged evidence here is "only" the "testimony of a witness whom the police discovered as a result" of defendant's statements. *Tucker,* 417 US 450. If the name of a potential witness is "of no evidentiary significance, *per se,* " *Ceccolini,* 435 US 277, then defendant here, who did not know the names of the witnesses, gave the police even less.

Moreover, even if defendant had not given any statement, there is every reason to believe that the identities of Mr. Mack and Mr. Wright would have been discovered in the course of a competent police investigation. It is clear that, before defendant was interviewed, the police had a great deal of information about the crime and about defendant's involvement in it. If defendant had not made any statement to the police, we can be sure that the investigation of these execution-style killings would have continued. At this point, it is impossible to say with certainty what would have happened next or whether the police would have sought information at the Speedy-Q gas station, and that is precisely why the United States Supreme Court has declined to apply the

exclusionary rule to living witnesses. But, in keeping
with human nature, it is more likely than not that Mr.
Mack and Mr. Wright would have become aware of and
taken an interest in news of the double murder that
took place during their work hours and in the area
where they worked. The record shows that both Mr.
Mack and Mr. Wright recognized and identified defen-
dant at trial. According to their testimony, they were at
the Speedy-Q gas station every night in the course of
their work. They testified willingly. There is no sugges-
tion that they were subjected to any police pressure,
and it is certain that they were subject to the "normal
testing process of an adversary system" through cross-
examination. *Tucker,* 417 US 449. Suppression of their
testimony would do nothing to preserve the adversary
process, *Nix,* 467 US 446, and would place the police in
a worse position than if defendant's Sixth Amendment
right to counsel had not been violated.

The disqualification of "knowledgeable witnesses
from testifying at trial" would be a serious obstruction
"to the ascertainment of truth." *Ceccolini,* 435 US 277.
As recognized by the majority, neither the exclusionary
rule nor the inevitable discovery doctrine have been
previously applied to the testimony of witnesses who
were named in a defendant's statement, even when that
statement was procured in the absence of counsel.
*Tucker,* 417 US 444. Here, where the alleged constitu-
tional violation played no "meaningful part in the
witness[es]' willingness to testify," *Ceccolini,* 435 US
278, and the testimony was the product of free will, I
believe that the testimony of Mr. Mack and Mr. Wright
is admissible.

In my opinion, remanding this matter to the trial
court is a waste of time and an exercise in pretense.
Because there is no way to know what would have

happened under different circumstances, the trial court will be forced by the majority, on remand, to either exclude the tenuous "fruit" of defendant's voluntary statement on what amounts to a whim, or to speculate that the witnesses would have been discovered as a result of a competent police investigation. I would prefer to admit that the connection between defendant's statements and the witnesses' willing testimony is too attenuated to presume prejudice, and that the exclusionary rule simply does not apply in this case. The "cure" for the alleged Sixth Amendment violation here is the suppression of defendant's statements as substantive evidence against him. Defendant has been afforded that protection and is not entitled to anything more.