PEOPLE v GIOGLIO

Docket No. 293629. Submitted November 4, 2010, at Grand Rapids.
    Decided April 5, 2011, at 9:10 a.m. Reversed and remanded to the
    Court of Appeals, 490 Mich 868. Trial court's order vacated and
    case remanded by unpublished order entered November 15, 2011.
    Opinion on remand from Supreme Court reported at 296 Mich App
    12.

    Jeffrey P. Gioglio was charged in the Kalamazoo Circuit Court with
        two counts of second-degree criminal sexual conduct and one
        count of attempted second-degree criminal sexual conduct. At
        trial, defense counsel did not cross-examine the child victim and
        did not present any witnesses or evidence. The jury convicted
        defendant as charged. After sentencing, the assistant prosecuting
        attorney sent the court administrator a letter expressing concerns
        she had about defense counsel's performance before, during, and
        after trial. Defendant obtained new counsel and moved in the trial
        court for a new trial, arguing that his original defense counsel had
        provided ineffective assistance. The court, Pamela L. Lightvoet, J.,
        held a hearing on the motion. Defense counsel testified about the
        strategic reasons underlying her actions at trial and provided
        testimony about her pre- and posttrial conduct, which conflicted
        with the prosecuting attorney's testimony. The court concluded
        that defense counsel's trial strategy was reasonable and that,
        although defense counsel might have acted unprofessionally out-
        side the courtroom, her conduct did not rise to the level of
        ineffective assistance. The court ruled that defendant had not
        established a reasonable probability that the outcome of the trial
        would have been different in the absence of defense counsel's
        actions. Defendant appealed.

        The Court of Appeals held:

        Every person accused of a crime has the right to effective
    assistance of counsel. To succeed in a claim that counsel was
    ineffective, a defendant generally must show that trial counsel's
    performance fell below an objective standard of reasonableness
    and that it is reasonably probable that the result of the proceeding
    would have been different had it not been for counsel's error.
    However, a presumption of prejudice is appropriate without in-
    quiry into the actual conduct of the trial when the defendant was
    completely denied the assistance of counsel at a critical stage,

when the defendant's trial counsel entirely failed to subject the prosecution's case to meaningful adversarial testing, or when the circumstances under which the defendant's trial counsel functioned were such that the likelihood that any lawyer, even a fully competent one, could provide effective assistance is small. If a defendant does not argue that defense counsel failed on the whole to subject the prosecution's case to meaningful adversarial testing but instead argues that discrete acts at specific points in the trial were inadequate, the proper test includes the consideration of whether counsel's conduct affected the outcome of the case. Although defense counsel took some action on defendant's behalf, she completely failed to submit the prosecution's case to meaningful adversarial testing and did so little to counter the prosecution's evidence of defendant's guilt that it was tantamount to having no defense lawyer present at all.

Reversed and remanded for a new trial.

K. F. KELLY, J., dissenting, would have held that defense counsel's conduct did not amount to a complete failure to submit the prosecution's case to meaningful adversarial testing and that defendant was arguing that counsel was inadequate at specific points in the trial. Thus, prejudice should not have been presumed but should have been taken into account. Judge KELLY would have held that defense counsel's actions were strategic and not to be second-guessed and that counsel's assistance was not deficient. Any errors would not have changed the outcome because the evidence against defendant was overwhelming.

CONSTITUTIONAL LAW — RIGHT TO COUNSEL — INEFFECTIVE ASSISTANCE OF COUNSEL — MEANINGFUL ADVERSARIAL TESTING.

To succeed in a claim that counsel was ineffective, a defendant generally must show that trial counsel's performance fell below an objective standard of reasonableness and that it is reasonably probable that the result of the proceeding would have been different had it not been for counsel's error; a presumption of prejudice is appropriate, however, without inquiry into the actual conduct of the trial (1) when the defendant was completely denied the assistance of counsel at a critical stage, (2) when the defendant's trial counsel entirely failed to subject the prosecution's case to meaningful adversarial testing, or (3) when the circumstances under which the defendant's trial counsel functioned were such that the likelihood that any lawyer, even a fully competent one, could have provided effective assistance were small; but if a defendant does not argue that his or her counsel failed on the whole to subject the prosecution's case to meaningful adversarial

testing, but instead argues that discrete acts at specific points in the trial were inadequate, the proper test includes the consideration of whether counsel's conduct affected the outcome of the case (US Const, Am VI; Const 1963, art 1, § 20).

*Bill Schuette*, Attorney General, *John J. Bursch*, Solicitor General, *Jeffrey R. Fink*, Prosecuting Attorney, and *Cheri L. Bruinsma*, Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Desiree M. Ferguson*) for defendant.

Before: M. J. KELLY, P.J., and K. F. KELLY and BORRELLO, JJ.

M. J. KELLY, P.J. Defendant Jeffrey Paul Gioglio appeals as of right his jury convictions of two counts of criminal sexual conduct in the second degree (CSC II) and one count of attempted CSC II. See MCL 750.520c(1)(a). The trial court sentenced him to serve 80 to 270 months in prison for his first CSC II conviction, 60 to 270 months in prison for his second CSC II conviction, and 18 to 90 months in prison for his conviction of attempted CSC II. On appeal, defendant argues that he did not have the assistance of counsel that the United States Constitution guaranteed him. And the record of the trial proceedings strongly suggests that he did not receive the kind of vigorous representation that one would expect in a trial that could—and did—result in a lengthy prison sentence. Indeed, after reviewing the trial record in light of the evidence adduced at the hearing on defendant's motion for a new trial, we conclude that the trial court erred, as a matter of law, when it summarily concluded that this case did not implicate *United States v Cronic*, 466 US 648; 104 S Ct 2039; 80 L Ed 2d 657 (1984), and instead

analyzed defendant's motion solely under the test
stated in *Strickland v Washington*, 466 US 668; 104 S
Ct 2052; 80 L Ed 2d 674 (1984). Defendant's trial
counsel failed to subject the prosecution's case to any
meaningful adversarial testing. Therefore, prejudice
must be presumed under *Cronic*. Accordingly, we re-
verse defendant's convictions and remand for a new
trial.

## I. PROCEDURAL HISTORY

The prosecutor charged defendant with three counts
arising from alleged sexual contact between defendant
and his niece, TB, who was approximately six years old
at the time of the events at issue. The prosecutor
charged him with two counts of CSC II for his conduct,
which included causing TB to touch his penis. The
prosecutor also charged him with one count of attempt-
ing to commit CSC II for an incident where TB's mother
discovered TB sitting on defendant's lap in her under-
clothes.

## A. THE TRIAL

The trial began on the same day that the parties
selected their jury. The prosecuting attorney, Christine
Bourgeois, opened the case by giving a short summary
of the evidence that she proposed to offer. She stated
that, in May 2004, TB's mother walked into her daugh-
ter's room and saw TB "straddling" defendant's lap on
a chair and "rocking" and she could see that defendant
"had an erect penis." The prosecution then explained
that the evidence would show that this was not the only
incident; TB would testify about two other incidents
where he touched TB or had TB touch him "for a sexual
purpose." She stated that TB would give the "specifics
on exactly what happened" and that there would also be

corroborating evidence. Based on the evidence she planned to present, she asked the jury to find defendant guilty. Defendant's trial counsel, Susan Prentice-Sao, elected not to give an opening statement, but reserved it for later.

The prosecution's first witness testified that she was TB's physical education instructor for the 2008 to 2009 school year. The instructor testified that there was an incident in gym class where several students told her that TB had been telling other students that "her uncle had raped her." The instructor stated that she notified various persons and that, as a result, child protective services became involved. Prentice-Sao did not object to the instructor's testimony about what TB purportedly told other students,[1] and did not cross-examine the instructor.

The prosecution next called TB to testify. She testified that she was born in 1998 and that in 2004 she and her family lived at her grandmother's house in Kalamazoo along with defendant. She said, without objection, that defendant came to live with her after it was learned that his father "did some bad stuff to football players." She stated that while living at her grandmother's home, defendant "raped" her.

TB stated that on one occasion defendant kissed her on the lips and all over her body; he "French-kissed" her. On another day, defendant was mowing the lawn and when he finished he got her and took her behind the "air conditioning vent-type thing" and "stuck his private area out from—out from under his—he un-

---

[1] The instructor's testimony was hearsay within hearsay and quite possibly objectionable. See MRE 801; MRE 802; *People v Rodriquez (On Remand)*, 216 Mich App 329, 332; 549 NW2d 359 (1996) (noting that testimony by teachers relating what the victim allegedly told them was inadmissible hearsay).

zipped his pants and stuck his private up" and then made her "touch it and lick it." She said that she licked it once and that he said "[TB] you're doing it" while she licked it. She said she did not tell anyone at the time because she did not know any better. TB said that, on another day, he took her behind the couch, had her unzip her pants, and kissed her "private area." He "pulled down my pants and underwear, and then kissed my private area."

As for the final incident, TB testified that defendant sat on the desk chair in her room and asked her to sit on his lap. She "was sitting with [her] legs spread apart on his lap facing him." She was wearing her nightgown and socks and he was about to make her touch his penis. She knew this because he "folded down his pants and boxers and stuck up his penis and—and before he was—he was trying to stick up his penis," but her mother walked in.

TB testified that she finally told a girl at school and her gym teacher because she could not hold it in any longer. She did not tell her mother about the other incidents until after someone came to her school to speak to her about the incidents. After Bourgeois finished her direct examination, Prentice-Sao informed that court that she had no questions for TB.

HB testified next that she was defendant's half-sister and TB's mother. She stated that she and her family were living with her adoptive mother when her half-brother "came into a bind" and she took him into her home.

HB said that she has a sleep disorder and that her daughter normally stays in the living room with her when she sleeps. She said she awoke because she could not hear TB playing and got up to look for her. She found TB in her room with defendant: "[TB] was in her

underwear, and [defendant] was on her desk chair in his pajama bottoms and [TB] was straddling him. And I walked in, and I told [defendant] to get the heck out of my house." She said that when defendant got up she noticed that he had an erection. HB said that defendant tried to blame the incident on TB, stating that "it was her fault." HB said she did not report the incident at that time because she thought she could handle it. After the incident came to light, she told an officer that defendant told her at the time that TB "wanted it."

HB also said that she knew about a prior incident where her mother mentioned that she saw TB and defendant behind the air conditioner outside and TB had her pants undone. She said she put precautions in place to prevent any further problems but kicked him out after the incident in the bedroom.

At the close of direct examination, Prentice-Sao cross-examined HB. She asked her about what her mother noticed on the day TB was outside by the air conditioner with defendant. HB responded that her mother told her that she saw TB with her zipper undone. Prentice-Sao then asked about the visibility around the area where the compressor unit was in the yard. She then elicited testimony about the nature and frequency of HB's discussions with TB about good touches and bad touches before the incidents at issue.

On redirect examination, HB agreed that she talked to TB about good touches and bad touches a couple of times and was surprised that TB never told her about defendant's actions.

HB's adoptive mother, SC, testified next. She said that she was living with HB and HB's family in Kalamazoo. Defendant moved in with them on Labor Day weekend in 2003. SC said that there is an air-conditioning unit outside in an area that is difficult to

see from anywhere in the house and that is also concealed from the neighbors. She testified that defendant would often play with TB and that he was willing to play with her on a more "childlike level." She recalled that there was a time when TB came in from playing outside with defendant and had her zipper down.

She stated that, at some point in the spring or summer of 2004, she received a call at work from her daughter. Her daughter told her that something happened between TB and defendant; specifically, HB told her that she believed defendant "acted sexually toward [TB]." SC stated—without objection—that, although she did not initially have suspicions about defendant, "it was something I was always wary of because I knew [defendant's] history of having been abused as a child." She further stated that she decided to question TB and defendant individually to find out what happened.

SC testified that TB responded to her questions as though she did not know what she was talking about. She got the impression "that nothing had happened—or at least nothing that [TB] perceived to have happened." When Bourgeois asked SC about her reaction given the "allegations [that] have surfaced," she testified that TB must have felt that "she had to protect him, that he had probably told her that it was not something she should tell anyone else, that other people wouldn't understand." Prentice-Sao did not object to this question and answer and Bourgeois immediately asked SC whether she really knew that and SC agreed that it was just her guess.

SC testified that defendant denied that there had been any inappropriate touching, but that "he and [TB] loved each other and that [TB] had told him she loved him and they wanted to get married and have children." He appeared to believe that this was a possibility. She

said she explained to him that it was inappropriate, wrong, and illegal, but he "didn't seem to understand that":

> And I said, you know, Jeffrey, even if she was—even if she was 16 years old and was begging you for sex, it would be wrong and illegal because you're an adult and she's a child. And he was just—seemed totally unable to see that line of what was appropriate and what was not.

She said he just kept saying "but we love each other." She stated that she took her time with him to ensure that he understood her but "felt pretty certain that I had not gotten through to him, which is why I determined that he couldn't stay in our house." SC testified that she contacted defendant's case manager and told her that there needed to be other arrangements for his living situation, and the caseworker arranged for him to move into an adult foster home. She said that she asked defendant if he understood why he had to leave and he said "yeah, 'cause you're afraid of what might happen between me and [TB]."

Again, Prentice-Sao did not object to any of this testimony. Moreover, after the close of SC's direct examination, she informed the court that she had no questions for SC.

Detective Christina Ellis testified that she interviewed defendant about the accusations against him. He said that the accusations were "bull crap." He admitted that his sister walked in on him at a time when TB was sitting on his lap, but he denied that there was "inappropriate conduct." He told her that his family was always trying to get him in trouble and that his sister was trying to get him in trouble because "she did not like the mentally handicapped." He told her that he left the house because he and TB's father got into a

heated argument and that had TB not walked in on them, TB's father might not be here today.

Ellis said that, in her experience, it is sometimes difficult for the accused to admit what he or she has done, so she decided to help defendant admit what he had done by putting some blame on TB. When she told him that TB had a crush on him and wanted to marry him, "he giggled—almost seemed kind of pleased about that." He also stated that TB had tried to kiss him and, when asked whether TB might have kissed him when he was sleeping and he "didn't realize it was [TB] so he kissed her back," he told her that that "probably" happened. She said she told him she believed that, whatever had happened, it happened because "they cared so much about each other," and defendant agreed that "he did care a great deal about [TB]." He nodded in agreement when she told him it was her opinion that he only did what he did because he thought "what he was doing was the right thing because they had grown so close" and he was "simply trying to show [TB] his love for her."

Ellis said that she then told him that she knew "that he had been abused when he was younger. And so I explained to him the cycle of abuse and that sometimes when a child is abused—" At this point Prentice-Sao objected to the relevance of the testimony. The trial court sustained the objection and instructed the jury that it was not to consider during its deliberations whether defendant had been abused. Ellis said that when she asked defendant whether he did these things to TB in order to express his love, he responded, "possibly, yes, but he couldn't really remember."

On cross-examination, Prentice-Sao asked Ellis whether defendant ever said he touched TB or had TB touch him, and she admitted that he did not ever say that.

She also admitted that uncles do love their nieces and that it would not be unusual for an uncle to say so.

Bourgeois's last witness was a mental health therapist, Connie Black-Pond. The trial court qualified her, without objection or voir dire, as an expert in the assessment and treatment of children and adults who have been sexually abused. Black-Pond testified generally about certain characteristics and behaviors that are common in children who have been sexually abused. Specifically, she testified about why it is that sexually abused children might not disclose the abuse until long after it has occurred, that when they do first disclose the abuse they might minimize it and often have trouble relating the details. Finally she testified that abused children might show a range of emotions when describing how they were abused and might even seem detached when describing the abuse.

On cross-examination, Prentice-Sao got Black-Pond to admit that women can be abusers as well as men. She also got her to admit that children are capable of lying. She then asked Black-Pond to describe the types of signs that would reveal that a child is lying. Black-Pond testified that children who are lying "often provide descriptions of events that actually tend not to change over time." She also stated that the child's description of the events might lack context and some of the emotional qualities that normally accompany descriptions of abuse, such as the "quality of relationships" and "worries the children have."

On redirect examination, Black-Pond testified that her evaluations "are not intended to determine if children are telling the truth or lying." In any event, she stated, the percentage of children that make false allegations is "very small." Indeed, the research shows that about "two percent of—of the disclosures [are] potentially false."

Prentice-Sao did not object to Black-Pond's testimony on redirect—including the testimony that there was, in effect, a 98% chance that TB's allegations were true. She also did not examine Black-Pond any further.

After Black-Pond testified, Bourgeois rested the prosecution's case. Prentice-Sao then rested her case without presenting any witnesses and without making an opening statement.

In closing, Bourgeois summarized TB's testimony and then told the jury that TB's testimony alone satisfied the elements of each of the charges at issue; "So if you believe [TB], the defendant's guilty." Bourgeois then went on to state why it is that the jury should believe TB. And specifically she noted that children normally lie to get out of trouble, not to get into trouble; and TB had to endure the trouble of relating what happened to her to a police officer, a forensic interviewer, a prosecutor, the court, 12 strangers, and anyone else who happened to be in the court. Bourgeois, however, apparently forgot to change her closing statement to reflect the realities of the trial, because she stated that the fact that TB endured cross-examination was further evidence that she was telling the truth:

> She underwent a cross-exam. Most adults would have had difficulty simply talking about sexual acts, let alone coming in here being cross-examined, talking about it in front of all these people; yet she went through that.
>
> She had a lot of fun doing that, didn't she? You saw her reaction when I asked her how it felt. She was on the verge of tears and didn't quite react. She had a lot of fun.

Bourgeois then used Black-Pond's expert testimony as a possible explanation as to why TB might have waited so long to disclose the abuse. She also noted that TB was credible because her testimony was not rehearsed: "If she had zipped through everything and

been real factual and real clear on it, wouldn't we have thought it was rehearsed? If everything she said matched exactly what grandma and mom said, wouldn't we have thought they all sat down and colluded and planned this for some reason?" Finally, Bourgeois stated that the "United States Constitution claims justice for all," including "the small victims, even when we don't want to believe that these things happen." And she closed her remarks by asking the jury to find defendant guilty.

Prentice-Sao began her closing remarks by noting that Black-Pond admitted that children lie. She also reminded the jury that defendant had to move into an adult foster home after he was kicked out of the home and that HB kicked him out around the time that she became pregnant. She then stated that TB "testified with robotic and rehearsed precision. There was no evidence of any inconsistencies. No evidence that her story evolved or changed in any way." Prentice-Sao also said she thought that TB showed a lack of emotions and suggested that this was because there was no abuse. She also argued that the adults were not very credible because there were inconsistencies in their statements. Finally, she noted that there did not appear to be any trigger that might have caused TB to suddenly reveal the abuse so many years later and, as such, there was reasonable doubt as to whether defendant was guilty.

In rebuttal, Bourgeois argued that TB's testimony was consistent because she told it to the jury just once—and the inconsistencies with the adults was to be expected when relating events that occurred so long ago. Bourgeois then reminded the jury that Black-Pond had said that studies show that only 2% of children falsely report sexual abuse. She also noted that there was a trigger—gym class. And that, even though we do

not know exactly what the trigger was, it is consistent with the types of things that happen in gym. Finally, Bourgeois reminded the jury that TB was in fact quite emotional: "But we saw her feelings. We saw her tear up. It looked like she was on the verge of tears. She didn't have a word to say how she felt about it. It was five years earlier. But it clearly traumatized her. We saw that trauma."

The jury then retired to deliberate at 11:32 a.m. At 1:30 p.m., the jury returned a verdict of guilty on all three counts. This appeal followed.

### B. THE MOTION FOR A NEW TRIAL

In October 2009, Bourgeois wrote to the court administrator and expressed concerns about Prentice-Sao's handling of defendant's trial. She alleged that Prentice-Sao had confided in her that defendant had admitted guilt and wanted to testify. Bourgeois said that Prentice-Sao said she was going to call defendant to the stand and ask him whether he engaged in the conduct at issue, which she expected he would deny. Bourgeois stated that she told Prentice-Sao that she could not ask him that question under the rules of ethics. Prentice-Sao also told her that she could not bring herself to question a child sexual assault victim. Finally, Bourgeois stated that, after sentencing, Prentice-Sao "greeted me with a big smile, a thumbs-up, and the statement 'He's toast!' "

The court administrator asked Prentice-Sao to respond to Bourgeois's claims in writing. In a letter dated November 12, 2009, Prentice-Sao responded to the accusations made by Bourgeois. Prentice-Sao admitted that she told Bourgeois that defendant had made some admissions but claimed that she did not state "which admissions were made" and did not state "that he

admitted all of the charges as laid out in the police report." Prentice-Sao also stated that she told Bourgeois that she did not plan to question the child because then Bourgeois might not "go overboard preparing her for trial." She said she actually chose not to question TB because TB revealed new information on direct examination that might have led to new charges. She also stated that it would not have been possible to impeach the child because she

> did not have a history of lying, having problems in school, or being difficult at home. She did not have a prior criminal record. She was not snotty or robotic. The whole time she testified the jury sat on the edge of their seats, looked horrified, and paid attention. I know this, because I watched the jury throughout her entire testimony.

Prentice-Sao also did not deny that she smiled and gave Bourgeois a thumbs-up after defendant's sentencing; rather, she admitted that this was "possible," but "I don't remember." However, *if* she did that, she imagined that it was because she "was just happy that the case was over." Likewise, *if* she said he was "toast," which she did not remember, then she imagined that she said that because it was "accurate" considering his sentence.[2]

In November 2009, defendant's new counsel moved for a new trial premised on ineffective assistance of counsel. Specifically, defendant's new counsel argued that defendant was deprived of the assistance of counsel under the test stated in *Cronic*, because Prentice-Sao completely failed to advocate on his behalf, and because

---

[2] As can be seen from the record, Prentice-Sao very carefully avoided denying these claims and instead professed that it was "possible," but that she did not remember. For that reason, we cannot understand the dissent's assertion that Prentice-Sao outright denied having smiled, gestured, and exclaimed, "He's toast!"

her representation was constitutionally ineffective under the test stated in *Strickland*. The trial court held a hearing on the motion in February 2010.

At the hearing, Bourgeois testified that she was assigned to prosecute the charges against defendant. After the close of the case, she sent a memorandum to the court administrator. She sent the letter because she had concerns about Prentice-Sao's handling of defendant's case and, after speaking with "some people in the office," she was instructed to notify the court administrator. In her 17 years as a prosecutor, she had never before sent such a letter; indeed, she never even made a verbal complaint.

Bourgeois stated that she had concerns after a few events that occurred during trial. It struck her when Prentice-Sao did not cross-examine the victim because "the victim gave differing testimony than anything that we had seen in any of the reports."

Bourgeois also testified that, after her expert reviewed the file, the expert expressed concern that defendant would need special services in prison should he be convicted. Because she expected defendant to be convicted, she approached Prentice-Sao about seeking those services, but it "was at that point that [Prentice-Sao] told me that he wasn't innocent [and] that he had told her that he had done it." Bourgeois acknowledged that Prentice-Sao claimed that this discussion arose during plea negotiations, but stated that this was incorrect.

Prentice-Sao also "made it very clear to me on multiple occasions that she could not question a child sexual assault victim." Bourgeois stated that Prentice-Sao might have told her this as many as a "dozen times." Prentice-Sao also said that defendant "made her sick" and told Bourgeois that "she couldn't stand to

look at him." Prentice-Sao even told her at trial that defendant "was downstairs and she knew that he wanted to talk to her, but that she wasn't going down[,] that he made her sick." Bourgeois testified that she had seen Prentice-Sao "mimic" defendant's speech impediment on "two or three occasions." Bourgeois testified that, after defendant's sentencing, Prentice-Sao gave Bourgeois "a big thumbs up with a big smile and said, He's toast." She stated that Prentice-Sao did not seem disappointed, but had a "happier voice." She also did not believe that Prentice-Sao was being sarcastic or flippant; she believed her. Based on Prentice-Sao's handling of the trial, Bourgeois stated that she felt as though "we had both just prosecuted him."

Prentice-Sao testified that she had practiced criminal, bankruptcy, estate planning, and family law for five years. She stated that this was the first case where she had an opportunity to work with Bourgeois as a prosecutor. And her interactions with Bourgeois were "challenging" and not "professional." She felt that Bourgeois was condescending towards her and stated that Bourgeois once told her that the case was "too big" for her to handle. She said that Bourgeois tried to tell her how to proceed with her case and asked her about the details of her defense. She said that she gave Bourgeois "snotty" responses that were not genuine. She did not try to "dissuade" Bourgeois from thinking that she did not know what she was doing. In the end, Prentice-Sao testified that Bourgeois misinterpreted her statements—that she misunderstood things that she "meant to be snotty" and took them to heart.[3]

---

[3] We find it troubling that, even when read from a transcript, Prentice-Sao's testimony appears impish and contrived; it seems that she was unable or unwilling to appreciate the gravity of the moment.

Prentice-Sao testified that she did have discussions with Bourgeois about his admissions, but that those conversations occurred during plea negotiations. She said that Bourgeois wanted to know if he would be able to admit to the elements of the crime and she told her "possibly." She also noted that defendant had made some general admissions in the police reports, but she denied that she ever told Bourgeois that defendant had admitted that he did it.

Prentice-Sao stated that she has had occasion to question children in her past practice and would not hesitate to question a child if necessary. She said she "aggressively" spoke with defendant about accepting a plea deal because TB was such a compelling witness:

> [TB's] statements to the police and the forensic experts and prosecutors had been consistent, but not consistent to the point of being of—showing signs of coaching. Her language, vocabulary didn't show signs of coaching. It was age appropriate. And I had spoken with . . . the prosecutor who charged the case and who did the initial interview with [TB] . . . and had learned that she thought that the testimony of [TB] was extremely strong; one of the best child witnesses that she had ever interviewed and one of the best sexual assault victims that she had ever interviewed.

At trial, Prentice-Sao decided not to cross-examine TB because she testified about additional details concerning the events and thought that these details could lead to more serious charges: "My concern was that if I did anything to highlight those incidences, Chris Bourgeois would become aware and amend the felony complaint to include CSC one, which is a life offense." She thought that by avoiding the cross-examination, Bourgeois was "going to miss the boat and not amend the complaint." She also did not want to alienate the jury because it was clear to her that they were "on the edge

of their seats" and "looked like they were believing her." Indeed, on cross-examination, Prentice-Sao stated that she herself "believed the child." Finally, she stated that she wanted to be able to argue that TB's testimony was "rehearsed and coached"; so she could not highlight that TB's story "had expanded."

Prentice-Sao testified that she was not sure if defendant would testify because he had an unpredictable personality. However, in case he did testify, she wanted to reserve her opening statement so that she could give a statement before he testified. Ultimately, defendant decided not to testify after her advice. She said that she had concerns about his mental abilities and his mental health and that he was emotional, unpredictable, and easily upset. Thus, she was worried about how he would hold up under cross-examination. She was even concerned that he might reveal his penis to the jury. Because defendant agreed not to testify and she did not have any further proofs, she no longer had a need for an opening statement; this was the reason that she did not give an opening statement.

Prentice-Sao also testified generally about the advocacy that she performed on defendant's behalf outside the actual trial. She noted that she wrote him letters, spoke with him on the phone, spoke with his treatment team at Spectrum Health, and arranged for a forensic interview. She stated that she did not "know what else I could have done differently."

When asked whether she disregarded defendant's request to visit with her at any point during the trial, Prentice-Sao stated that she did not "know when there would have been time to speak with me or to disregard him." She also stated that she did not remember ever giving Bourgeois a thumbs-up or saying that defendant was "toast."

In March 2010, the trial court issued an opinion and order denying defendant's motion for a new trial. The trial court—without explaining its reasoning—first determined that the "case does not contain the type of circumstances which call for an analysis under *Cronic*." It then examined defendant's claim of ineffective assistance under the test stated in *Strickland*. The trial court determined that "it was reasonable for defense counsel to waive an opening statement" and to not "question the minor victim." Because Prentice-Sao's reasons were logical and reasonable, the trial court ruled that defendant failed to overcome the presumption that his attorney's "actions constituted sound trial strategy." The trial court also rejected defendant's contention that his trial counsel violated the rules of professional conduct or exhibited hostility towards him.

In its opinion, the trial court recognized that there was conflicting testimony, but did not resolve the conflicts through findings of fact. It did find that there was "animosity and a lack of respect" between Bourgeois and Prentice-Sao but did not state how that finding applied to the claims of ineffective assistance of counsel; it merely stated that the actions did not "rise to the level of ineffective assistance of counsel." Finally, the trial court determined that defendant failed to establish a reasonable probability that the outcome of the trial would have been different but for his trial counsel's actions.

This appeal followed.

## II. THE RIGHT TO COUNSEL

### A. STANDARDS OF REVIEW

This Court reviews de novo questions of constitutional law such as whether a defendant was deprived of

his constitutional right to the assistance of counsel. *People v Bryant*, 483 Mich 132, 138, 768 NW2d 65 (2009). However, to the extent that the trial court made findings of fact related to a defendant's claim that he was denied the effective assistance of counsel, this Court reviews those findings for clear error. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002).

### B. THE *CRONIC* AND *STRICKLAND* TESTS

The United States and Michigan constitutions protect the right of an accused to have the assistance of counsel. US Const, Am VI; Const 1963, art 1, § 20. The right to have the assistance of a lawyer is a fundamental component of our criminal justice system: "Their presence is essential because they are the means through which the other rights of the person on trial are secured." *Cronic*, 466 US at 653. "That a person who happens to be a lawyer is present at trial alongside the accused, however," is not enough to guarantee the right; this is because the right "envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results." *Strickland*, 466 US at 685. For that reason, the right to counsel includes the right to the effective assistance of counsel. *Id.* at 686. That is, an accused is "entitled to be assisted by an attorney, whether retained or appointed, *who plays the role necessary to ensure that the trial is fair.*" *Id.* at 685 (emphasis added). Where an accused's counsel's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result," the accused has not received the effective assistance of counsel. *Id.* at 686.

When examining a claim of ineffective assistance of counsel under either the United States or Michigan constitutions, Michigan courts generally apply the test

stated in *Strickland. People v Frazier*, 478 Mich 231, 243; 733 NW2d 713 (2007) ("Most claims of ineffective assistance of counsel are analyzed under the test developed in *Strickland* . . . ."); see also *People v Hoag*, 460 Mich 1, 5; 594 NW2d 57 (1999). This test takes into account the "variety of circumstances faced by defense counsel" and the wide "range of legitimate decisions regarding how best to represent a criminal defendant." *Strickland*, 466 US at 689. In order to warrant relief, the defendant must show that his or her trial counsel's performance fell below an objective standard of reasonableness and that it is reasonably probable that the result of the proceeding would have been different had it not been for counsel's error. *Frazier*, 478 Mich at 243, citing *Strickland*, 466 US at 687, 690, 694. Further, the defendant must overcome a "strong presumption" that his or her trial counsel's action was a matter of trial strategy. *Strickland*, 466 US at 489. Although Michigan courts will generally apply *Strickland* to ineffective-assistance claims, under certain rare situations, Michigan courts will presume prejudice under the test stated in *Cronic*. See *Frazier*, 478 Mich at 243.

In *Cronic*, the Court recognized that a defendant receives the kind of support envisioned by the Sixth Amendment where the defendant's trial counsel subjects the prosecution's case to "meaningful adversarial testing" even though he or she "made demonstrable errors." *Cronic*, 466 US at 656. However, "if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated." *Id.* at 656-657. The Court further recognized that there were circumstances involving trial counsel's performance that were so likely "to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Id.* at 658. In such cases, prejudice is presumed.

The Court in *Cronic* identified three situations warranting a presumption of prejudice: where the defendant was completely denied the assistance of counsel at a critical stage, where the defendant's trial counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing," and where the circumstances under which the defendant's trial counsel functions are such that "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Id.* at 659-660.

In the present case, we conclude that Prentice-Sao's performance implicates the second exception stated in *Cronic*—the failure to meaningfully test the prosecution's case.

### C. *CRONIC*: MEANINGFUL ADVERSARIAL TESTING

In *Cronic*, the Supreme Court recognized that, where a defendant's trial counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *Cronic*, 466 US at 659. In order to meet the requirements of this exception, a defendant must show that his or her counsel's "failure" was "complete"; that is, he must show that his counsel *"entirely"* failed to subject the prosecutor's case to meaningful adversarial testing. *Bell v Cone*, 535 US 685, 697; 122 S Ct 1843; 152 L Ed 2d 914 (2002). Where a defendant does not argue that his counsel failed on the whole to subject the prosecution's case to meaningful adversarial testing, but instead argues that discrete acts at specific points in the trial were inadequate, the proper test is that stated in *Strickland. Id.* at 697-698. "For purposes of distin-

guishing between the rule of *Strickland* and that of *Cronic*, this difference is not of degree but of kind." *Id.* at 697; see also *Moss v Hofbauer*, 286 F3d 851, 860-861 (CA 6, 2002) (listing cases where courts have found that *Cronic* applied). Nevertheless, even in cases where a defendant has the benefit of adversarial testing, his trial counsel's performance can be "so inadequate that, in effect, no assistance of counsel is provided." *Cronic*, 466 US at 654 n 11 (quotation marks and citation omitted).

In this case, Prentice-Sao did not make an opening statement and did not present any witnesses or evidence. Accordingly, the extent of her adversarial testing was limited to reacting to Bourgeois's examination of her own witnesses, to her cross-examination of Bourgeois's witnesses, and to her closing statement. And although an attorney might offer meaningful testing of a prosecution's case through objections, cross-examination, and closing arguments alone, this is not such a case.[4]

Prentice-Sao did not cross-examine TB's physical education instructor concerning the circumstances giving rise to the allegations in this case. By failing to address this evidence, she permitted an inference that TB's allegations came about spontaneously rather than out of circumstances tending to suggest fabrication. Further, she did not object to the instructor's hearsay testimony.

---

[4] On appeal, defendant cites specific moments where Prentice-Sao failed to test the prosecution's case, including the decision to not cross-examine TB. However, it is clear that defendant cites these incidents as evidence that Prentice-Sao failed to test the prosecution's case as a whole. We do not take these examples as proof that defendant's claim is really one premised on individual failings that should be analyzed under *Strickland*. To be thorough, we shall examine every action taken by Prentice-Sao at trial to determine whether, as a whole, those actions can be said to amount to meaningful adversarial testing of the prosecutor's case.

Prentice-Sao also did not cross-examine TB, whose testimony constituted the primary evidence against defendant on all three charges. She failed to cross-examine her even though TB's testimony at trial differed from that of her mother concerning the acts underlying the attempt charge and differed from her earlier accounts. She also did not test TB's memory, or ability to distinguish between innocuous contact and contact done for a sexual purpose. Prentice-Sao also failed to object when TB offered testimony that defendant came to live with her family after his father did something "bad" to football players. Thus, Prentice-Sao allowed Bourgeois to present her most damaging evidence without any challenge whatsoever.

As for TB's mother, Prentice-Sao did cross-examine her. However, she did not cross-examine her about the context surrounding the time she allegedly walked in on defendant while TB was straddling his lap, which was by far the most damaging testimony. Nor did she challenge her credibility by asking her pointed questions about her relationship with her half-brother. Instead, she asked some tangential questions about what her mother might have seen on the day defendant allegedly took TB behind the air conditioning unit. She did establish that HB had had discussions with TB about good touches and bad touches but failed to relate that testimony to the case in any meaningful way. Accordingly, HB's testimony, which corroborated and provided context to TB's testimony, was left unchallenged.

Prentice-Sao then allowed TB's grandmother, SC, to testify without objection that she knew defendant had been abused as a child. She also provided testimony that strongly suggested that defendant had a propensity to commit inappropriate sexual acts—also without objec-

tion. Indeed, she was allowed to testify that she kicked defendant out of her home because, despite her efforts to make him understand that his behavior was "wrong" and "illegal," he could not appreciate the "line of what was appropriate and what was not" and, for that reason, he could not be trusted around TB.[5] Prentice-Sao also allowed SC to testify that defendant had a case manager and that, after she kicked him out of her home, his case manger got him into an adult group home. Prentice-Sao nevertheless felt no need to cross-examine SC about any of this testimony.

Detective Ellis testified next about her interview with defendant. She stated that she tried to manipulate defendant into admitting that he committed the charged acts and suggested that she knew he was guilty. Indeed, she stated that she tried to help him admit his guilt by placing some of the blame on TB and by suggesting that his conduct was just his special way of showing how much he loved TB. Prentice-Sao allowed this testimony to go virtually unchallenged—her only objection was when Ellis began to testify that she knew that defendant had been abused and began to talk about the "cycle of abuse." And while the objectionable character of this line of questioning is obvious, Prentice-Sao had already allowed similar testimony that defendant

[5] It is noteworthy that Prentice-Sao completely failed to cross-examine any of defendant's family members about his mental limitations and how those limitations might have affected his ability to effectively communicate despite clear record evidence that she was aware of those limitations. Had she done so, she might have limited the harm caused by SC and Ellis's testimony that tended to suggest that defendant admitted to having inappropriate feelings for TB and engaged in the sexual conduct at issue. See *People v Yost*, 278 Mich App 341, 365-366; 749 NW2d 753 (2008) (holding that it was prejudicial error for the trial court to prevent the defendant from presenting evidence concerning her intellectual limitations because the implications of the defendant's statements could not be fully evaluated without understanding those limitations).

had been abused—possibly sexually—and might have a propensity to act in the same way. Moreover, on cross-examination, Prentice-Sao's questions were limited and not particularly useful to the defense; she got Ellis to admit that defendant never specifically admitted to doing the charged acts and to admit that uncles may love their nieces and might say as much. Yet the fact that uncles sometimes express love to their nieces is a matter of common sense, and that rejoinder did nothing to mitigate the harm caused by the testimony that defendant agreed that he might have kissed TB back if she kissed him first and agreed that anything that might have happened between him and TB happened because he loved her. Taken in light of SC's testimony that defendant—a grown man—purportedly said he wanted to marry TB and have children with her, this testimony was tantamount to an admission of guilt even in the absence of an admission to the specific acts.

Bourgeois's final witness was Black-Pond, who testified generally about some behaviors exhibited by children who have been abused. Bourgeois offered this testimony to explain why TB's reports of abuse might have been delayed, why she might have trouble relating the details of the abuse, and why her emotional response might not be what the jury would expect. Although Black-Pond offered no substantive evidence regarding the events at issue—indeed she admitted that she had not met TB and only knew about the case through written reports—Prentice-Sao saved her most extensive cross-examination, such as it was, for this witness.

On cross-examination, Prentice-Sao got Black-Pond to admit that women can be abusers, a fact that was completely irrelevant to the case at hand. She also got her to admit that children can and do lie, which is also

a matter of common sense. Finally, she got Black-Pond to describe some signs that a child's allegations might be false. Whatever good that this cross-examination might have produced was, however, quickly undone when Black-Pond testified on redirect that literature showed that only 2% of all allegations of abuse by children are false. That is, although Prentice-Sao got Black-Pond to admit that children might make false allegations and got her to describe some possible signs that TB's allegations might be false, she also allowed her to testify—without any objection—that there was a 98% chance that TB's allegations were true. After this particularly prejudicial testimony, both the prosecution and defense rested.

In her closing, Prentice-Sao's argument focused on reasonable doubt. She argued that TB's testimony appeared robotic and rehearsed and suggested that it was insufficient for the jury to find defendant guilty beyond a reasonable doubt. She made this argument despite the fact that Bourgeois already characterized TB's testimony in her closing as emotional, which, if true, would have been readily apparent to the jury, and despite the fact that the prosecution's expert testified that the vast majority of allegations of abuse made by children are true. She also suggested that the jury could not believe HB's corroborating testimony because there were inconsistencies between her version and that of TB. But she failed to discuss the inconsistencies at any length and failed to address Black-Pond's testimony that child victims will often get details wrong. It is also difficult to see how she could make this argument after she failed to explore the inconsistencies through cross-examination of the witnesses. Further, Prentice-Sao admitted after the trial that TB was an excellent witness, did not appear robotic or rehearsed, and that it

was obvious to her at the time that the jurors not only believed her but were on the edge of their seats throughout her testimony.

Examining Prentice-Sao's handling of the defense as a whole, we conclude that she completely failed to submit the prosecution's case to the meaningful adversarial testing contemplated under the Sixth Amendment to the United States Constitution and the Michigan Constitution. "While a criminal trial is not a game in which the participants are expected to enter the ring with a near match in skills, neither is it a sacrifice of unarmed prisoners to gladiators." *Cronic*, 466 US at 657 (quotation marks and citation omitted). Here, Prentice-Sao threw defendant into the ring with no defense whatsoever. She permitted Bourgeois to present a parade of damaging—and sometimes highly improper—testimony with virtually no objection and with no meaningful adversarial testing. She also mounted the feeblest of defenses imaginable under the circumstances: a defense that was undermined by her failure to bring out the flaws in the testimony of the prosecution's witnesses on cross-examination and that apparently was not supported by the actual events at trial. Indeed, the prosecutor herself characterized defendant's trial as one in which there were two prosecutors.[6] It is, therefore, no wonder that the jury returned a verdict of guilty on all counts after only two hours of deliberation and in a timespan that likely even included a break for lunch.

---

[6] Although we believe Prentice-Sao's deficient handling of this case is evident on the record alone, we find it particularly noteworthy that Bourgeois felt compelled to report Prentice-Sao: the first time she so felt compelled in her 17-year career. Prosecutors are not known for challenging the fairness of the trials they prosecute and the fact that Bourgeois did so is—besides an act of courage—compelling evidence that defendant did not receive proper representation at trial. It is troubling that our dissenting colleague sees fit to traduce the prosecutor for this.

Defendant may very well be guilty and might deserve a lengthy prison term, but our constitutions do not reserve the right to the effective assistance of counsel to only those defendants who are actually innocent; rather, the integrity of our criminal justice system demands that every defendant receive effective assistance of counsel. In this case, it is clear that Prentice-Sao's performance was so inadequate that, in effect, defendant had no assistance of counsel at all. See *Cronic*, 466 US at 654 n 11; see also *Rickman v Bell*, 131 F3d 1150, 1157 (CA 6, 1997) (stating that the defendant's trial counsel's total failure to actively advocate for his client's cause coupled with his expressions of contempt for the defendant amounted to the provision of a second prosecutor rather than a defense counsel, which warranted reversal under *Cronic*). Accordingly, prejudice must be presumed under *Cronic* and defendant is entitled to a new trial.

### D. *STRICKLAND*

On appeal, defendant also argues that Prentice-Sao's total failure to challenge the prosecutor's case warrants the reversal of his convictions under the test stated in *Strickland*. Although we agree that Prentice-Sao's conduct of the defense was deficient in several respects,[7]

---

[7] Prentice-Sao failed to object to hearsay, failed to object to testimony that defendant had been abused and had a case manager, failed to object to suspect expert testimony concerning the veracity of sexual abuse allegations by children, failed to cross-examine several witnesses, provided inadequate cross-examination of others, failed to make an opening statement, and presented a defense attacking TB's credibility in her closing even though she herself testified that TB was an excellent witness and did not appear to be coached or rehearsed. Had defendant properly raised each of these shortcomings, we would conclude that these failings warranted a new trial in the aggregate without the need for a remand, even if no one error warranted relief on its own. *LeBlanc*, 465 Mich at 591.

defendant does not address the specific instances he claims deprived him of a fair trial under the test stated in *Strickland*. Instead, he merely refers to the examples cited in his discussion of *Cronic*. These include Prentice-Sao's alleged betrayal of his confidences and her decision not to cross-examine TB. However, given the record as it now stands, defendant likely cannot meet the prejudice prong of that test. See *Strickland*, 466 US at 694 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."). As Justice Stevens once noted, the failure to offer any meaningful adversarial testing makes a prejudice analysis difficult: "a proper *Strickland* inquiry is difficult, if not impossible, to conduct when counsel has completely abdicated his role as advocate, because the abdication results in an incomplete trial record from which a court cannot properly evaluate whether a defendant has or has not suffered prejudice from the attorney's conduct." *Bell*, 535 US at 718 (Stevens, J., dissenting). This is a case in point. By abdicating her ethical obligation to vigorously defend the accused—whether consciously or otherwise—Prentice-Sao created a record that gives the impression of overwhelming guilt. This problem was further exacerbated by the trial court's failure to make specific findings of fact after the hearing on defendant's motion for a new trial and specifically its declining to resolve the credibility dispute between Bourgeois and Prentice-Sao.

At the hearing, Bourgeois gave credible testimony that Prentice-Sao thought defendant was guilty and had expressed a strong dislike—even contempt—for him; she had said he made her "sick" and had stated that she could not even stand to "look at him." She also testified that Prentice-Sao refused to meet with her

client on one occasion because of her dislike for him. Bourgeois even saw Prentice-Sao mimic his speech impediment. She stated that Prentice-Sao had repeatedly—at least eight times, and perhaps as many as a dozen times—told her that she *could not* cross-examine TB. And Prentice-Sao testified that TB had not appearred to be lying and that she herself had believed TB. This evidence strongly suggests that Prentice-Sao's decision not to cross-examine TB had nothing to do with reasonable trial strategy; rather, it suggests that Prentice-Sao chose not to cross-examine TB because she believed TB was truthful and, for that reason, did not deserve to be put through a cross-examination on behalf of her guilty client. If that was the case, then Prentice-Sao's decision necessarily fell below an objective standard of reasonableness under prevailing professional norms. But the trial court did not make the findings necessary to resolve this issue.

Similarly, the trial court did not find whether Prentice-Sao actually told Bourgeois that her client was guilty and did not find whether Prentice-Sao expressed an unbecoming enthusiasm after the trial court gave defendant a lengthy sentence by giving Bourgeois a thumbs-up and exclaiming, "He's toast." The ascertainment of these facts would have gone a long way to aiding this Court in determining whether Prentice-Sao's individual decisions to object to testimony, to cross-examine witnesses, and to pursue the closing argument that she did were legitimate and reasonable efforts on behalf of her client.

This evidence also tends to suggest that Prentice-Sao had an intractable bias against her own client that made it impossible for her to make sound professional decisions on his behalf. Where an attorney has an actual conflict of interest that affects his or her ability to

advocate on behalf of a defendant and that conflict actually causes the attorney to take an action that was not in the defendant's best interest, the defendant is entitled to a new trial without a further showing of prejudice. See *Mickens v Taylor*, 535 US 162, 168; 122 S Ct 1237; 152 L Ed 2d 291 (2002). We conclude that an attorney's strong bias against his or her own client constitutes such a conflict of interest. See *United States v Swanson*, 943 F2d 1070, 1074 (CA 9, 1991) (noting that an attorney who adopts the view that his client is guilty and acts on that belief fails to function in any meaningful sense as the government's adversary). Yet the trial court did not make the findings necessary to resolve this matter either. Nevertheless, given our determination that Prentice-Sao failed to subject the prosecution's case to any meaningful adversarial testing, we do not need to determine whether defendant's inadequate representation also warrants relief under *Strickland*. Nor do we need to remand this case back to the trial court for more specific findings or for a clear resolution of the credibility dispute between Bourgeois and Prentice-Sao.

### III. RESPONSE TO THE DISSENT

As already explained, the present case implicates the "meaningful adversarial testing" prong of the test stated in *Cronic*. Our dissenting colleague faults us for applying this test because she believes that this test cannot apply in any case where a defendant's trial counsel took *any* action on behalf of his or her client—however meaningless that action might have been. But the United States Supreme Court did not state that the *Cronic* test applied only to those situations where there was *no* adversarial testing *whatsoever*; rather, it very clearly stated that there had to be a total failure to

subject the prosecution's case to *"meaningful* adversarial testing." *Cronic*, 466 US at 659 (emphasis added). That is, the Supreme Court recognized that there might be extreme cases where, although the defendant's trial counsel took some actions on behalf of his or her client, the actions were so few and so ineffectual that it was tantamount to having no lawyer present at all. See *id.* at 654 n 11. And a court reviewing such a case would be justified in presuming prejudice. *Id.* at 659-660.

Further, in order to determine whether a defendant's trial counsel subjected the prosecutor's case to *meaningful* adversarial testing, a reviewing court must necessarily evaluate the actions actually taken on the defendant's behalf—one simply cannot determine whether a defense was meaningful without evaluating the totality of the acts taken in furtherance of the defense. A trial lawyer might offer meaningful testing through pretrial procedures. However, consulting with other professionals, reviewing the law, and generally familiarizing oneself with the evidence do not constitute meaningful pretrial testing. In this case—as with the majority of cases—the true testing must take place before the jury. For these reasons, we carefully examined every action taken on defendant's behalf *at trial* to determine whether those actions, when viewed as a whole, amounted to "meaningful adversarial testing." We concluded that—as a matter of law—those acts did not meet that minimum threshold. It is clear that this is where we part company with our learned colleague: the dissent would conclude that an occasional objection, some limited and rather benign questioning on cross-examination, and a feckless closing statement that was contradicted by the evidence actually presented were sufficient to remove this case from application of the test stated in *Cronic*. We simply cannot agree.

The dissent also rebukes us for failing to properly apply *Strickland*. But as the dissent acknowledges, we did *not* apply *Strickland*. We noted that defendant presented a claim of error under *Strickland* and we explained that that claim would likely fail, but we chose not to address it given our resolution of defendant's claim under *Cronic*. We also explained that it would be difficult to even analyze this case under *Strickland* given that the prosecution's case was not subjected to *meaningful* adversarial testing. As should be obvious, where a defendant's trial lawyer fails to put on a meaningful defense, the evidence of guilt will invariably appear overwhelming. That is the reason for a presumption of prejudice. And, contrary to the dissent's claim, we did not "ignore" *Bell* by adopting the minority position on this point. Rather, we simply demonstrated that this rather unremarkable observation was not novel. In any event, notwithstanding that observation, we plainly applied *Bell*, which requires a showing that the failure to offer meaningful testing was "complete." See *Bell*, 535 US at 697.[8] Respectfully, it is the dissent that disregards the Supreme Court's guidance by effectively omitting the Court's reference to "meaningful" testing and instead asserting that any testing—even meaningless testing—is sufficient to preclude analysis under *Cronic*.

Given that we did not apply *Strickland*, it is also difficult to respond to the accusation that we failed to properly defer to the trial court's findings and credibility determinations. To this accusation we can only offer that one cannot defer to findings that were never made. As can be seen from the dissent's lengthy quotation of the

---

[8] In point of fact, there is no minority test in *Bell*. In his dissent, Justice Stevens did not express disagreement with the requirement that the failure must be entire in order to implicate *Cronic*. He merely expressed his disagreement with the majority's conclusion that the record showed that the defendant's trial counsel did offer some level of meaningful adversarial testing. See *Bell*, 535 US at 716-717 (Stevens, J., dissenting).

trial court's opinion, the opinion is devoid of any relevant findings. The trial court did state that it "was reasonable for defense counsel to waive an opening statement," that it was "reasonable for defense counsel not to question the minor victim," and that the court did "not find that such actions rise to the level of ineffective assistance of counsel," but those statements are conclusions of law—not findings. The only statement that could constitute a relevant finding is the court's admission that Prentice-Sao and Bourgeois had "different views about the discussions [and] events" at issue and that there was "animosity and a lack of respect between the attorneys."[9] However, contrary to the dissent's assertion, this did not resolve the credibility dispute between Prentice-Sao and Bourgeois and did not amount to a finding that Prentice-Sao did or did not take a specific action for any particular reason or that she made a specific statement. Thus, there was no relevant finding on this matter to which this Court could defer. Given the serious allegations against Prentice-Sao, one might be tempted to *infer* that the trial court must have made a finding in favor of Prentice-Sao in order to reach the result that it did, but even if we were inclined to apply *Strickland* to this case, unlike the dissent, we would not be inclined to make such inferences.[10] Rather, we would feel compelled to remand this matter for more definite findings.

---

[9] The court did briefly note that Prentice-Sao took some basic steps to prepare for trial and acknowledged her background working with children, but these findings did not resolve any of the disputes about the evidence that were material to determining whether Prentice-Sao was ineffective.

[10] While we noted that Prentice-Sao's testimony at the hearing appeared contrived, we did not make a specific finding or credibility determination. Instead, our analysis focused on the record and the actions actually taken by Prentice-Sao on her client's behalf.

We recognize that the presumption of prejudice under *Cronic* will apply only in the most extraordinary of cases. We believe that this is such a case. And, because this is such an extreme case, we find it difficult to believe that this conclusion will be the occasion for a flood of new *Cronic* claims. Whatever the faults in our system, we have no difficulty concluding that the vast majority of criminal defense lawyers not only subject the prosecution to meaningful adversarial testing, but also do so in a professional and effective way. This was one of those rare trials where that was not the case.

### IV. CONCLUSION

Defendant's trial counsel entirely failed to subject the prosecution's case to "meaningful adversarial testing." *Cronic*, 466 US at 659. Therefore, he did not receive the assistance for his defense that is guaranteed by the United States and Michigan Constitutions. Accordingly, we must reverse his convictions and remand for a new trial.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

BORRELLO, J., concurred with M. J. KELLY, P.J.

K. F. KELLY, J. (*dissenting*). I respectfully dissent from the majority's conclusion that defendant was denied his Sixth Amendment right to counsel pursuant to *United States v Cronic*, 466 US 648, 659; 104 S Ct 2039; 80 L Ed 2d 657 (1984). The majority completely misreads and misapplies *Cronic* and its progeny. In so doing, the majority reversibly errs. In my view, *Cronic* does not apply to the facts of this case, and the trial court properly applied the performance and prejudice test for claims of ineffective assistance of counsel as

articulated in *Strickland v Washington*, 466 US 668,
688, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984).
Moreover, the majority oversteps its authority by refus-
ing to defer to the credibility determinations of the trial
court and instead wrongfully substitutes its own pre-
ferred version of events to reach an outcome not war-
ranted by either the facts or law. As the trial court
properly determined, defendant failed to demonstrate
that counsel's performance was deficient or that he
suffered prejudice as a result of her alleged errors. I
would affirm.

### I. BASIC FACTS

Defendant, the victim's uncle, was charged with two
counts of criminal sexual conduct in the second degree
(CSC II) and one count of attempted CSC II. MCL
750.520c(1)(a) (victim under 13); MCL 750.520g(2). He
was also subject to an enhanced sentence as a second
habitual offender, MCL 769.10, having previously been
convicted of assault with a dangerous weapon, MCL
750.82.

The events giving rise to the CSC II charges stem
from sexual assaults committed by defendant against
the victim when she was five years old and living with
her grandmother. The first assault started when the
victim went to wake up defendant so that he could mow
the lawn. Defendant "French-kissed" her on the mouth
as well as kissing her arms, legs, and neck. The assault
ended when her mother called out to her and she left
defendant's room. The second assault occurred later that
same day. Defendant took the victim behind the air
conditioning unit, unzipped his pants, stuck his "private"
through the zipper and made her touch his penis for 10 to
20 seconds. Thereafter, he made her lick his penis while he
stated to her, "Yeah, . . . you're doing it." The following

day, defendant took the victim behind the couch, pulled down her pants and underwear and kissed her "private" area. The fourth assault occurred in the victim's bedroom. Defendant sat on a desk chair and told the victim to get on his lap and she did so facing him with her legs spread apart. He then folded down his pants and boxers and was trying to "stick up" his penis when her mother walked in. Both the defendant and the victim jumped, and the victim's mother ordered defendant out of the house. While defendant was leaving the bedroom, the victim's mother saw that defendant's penis was erect.

At defendant's arraignment on the charges, he requested a court-appointed attorney. Counsel, Susan Prentice-Sao, was appointed to represent him. Before trial, counsel met with defendant on numerous occasions and spoke with him by telephone. She successfully moved for a forensic examination and a competency hearing. She engaged in extensive discussions with members of defendant's family and defendant's mental-health-care providers. She consulted with other attorneys on trial strategy both before and during the trial and reviewed testimony previously given by the prosecution's expert witness. She successfully persuaded the prosecution to offer defendant a plea deal in which defendant would receive a sentence of five years' tethered probation with no jail or prison time. Defendant rejected the offer, as was his right, because he did not want to register as a sex offender. During the trial, defense counsel conducted voir dire and excused more than one juror. She cross-examined witnesses, made objections, requested and received a cautionary instruction, and argued in closing that there were inconsistencies in the trial testimony and that the victim's version of the assaults was not worthy of belief.

The jury found defendant guilty on all three counts. The trial court sentenced him as a second habitual offender to serve 80 to 270 months in prison for his first CSC II conviction, to serve 60 to 270 months in prison for his second CSC II conviction, and to serve 18 to 90 months in prison for his conviction of attempted CSC II.

Two months after sentencing, the assistant prosecuting attorney assigned to the case wrote to the court administrator, expressing "concerns" about defendant's representation. Defense counsel rejected the assistant prosecuting attorney's "concerns." No further action was taken by the court administrator or the office of the prosecuting attorney, and the assistant prosecuting attorney apparently did not share her "concerns" with the Attorney Grievance Commission.

Defendant requested and received appellate counsel. Appellate counsel moved for a new trial based on ineffective assistance of counsel. In support of the motion, defendant relied upon the representations from the assistant prosecuting attorney's letter to the court administrator. The office of the prosecuting attorney repudiated the assistant prosecuting attorney's position and vigorously opposed the motion.

At the evidentiary hearing on the motion for a new trial, both the assistant prosecuting attorney and defense counsel testified and had sharply divergent memories of events and the conduct of the trial. In a written opinion, the trial court denied the motion:

> Following a Jury Trial, the Defendant was convicted of two counts of Criminal Sexual Conduct-2nd Degree and one count of Attempted Criminal Sexual Conduct-2nd Degree. After the Trial, Assistant Prosecuting Attorney Christine Bourgeois wrote a Memorandum to the Court Administrator regarding the representation provided by the defense attorney. Defendant filed a Motion for New Trial. The Court heard arguments and testimony on February 26, 2010.

Defendant argues that his Sixth Amendment Rights were violated in this case as defense counsel failed to subject the prosecution's case to meaningful adversarial testing. In *United States v. Cronic*, 466 US 648, 658 (1984), the U.S. Supreme Court stated there are "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." Such circumstances would arise "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing [and] that makes the adversary process itself presumptively unreliable. No specific showing of prejudice [would then be required]." (citation omitted) *Id.* at 659. Additionally, there may be an occasion when circumstances of such magnitude are present wherein, "although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." (citation omitted) *Id.* at 659 - 660.

The instant case does not contain the type of circumstances which call for an analysis under *Cronic*, supra. Rather, the Court looks to the test outlined in *Strickland v. Washington*, 466 US 668 (1984). First, a Defendant must establish that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. Second, a reasonable probability must exist that, in the absence of counsel's errors, the outcome of the proceeding would have been different.

In this case, Defendant argues that defense counsel was ineffective in (1) failing to give an opening statement, (2) failing to cross-examine the minor victim, and (3) disclosing client confidences. Defendant outlined in detail various issues addressed by Assistant Prosecuting Attorney Christine Bourgeois in the Memorandum written by her after the Trial.

The Court sat through the trial, reviewed the parties' briefs and considered the arguments set forth by counsel. In determining whether there was ineffective assistance of counsel, a Defendant must overcome a strong presumption that the counsel's performance constituted sound trial

strategy. *People v Carbin*, 463 Mich 590, 600 (2001). At the hearing on February 26, 2010, defense counsel outlined her background and experience as an attorney. She testified that she spoke with three other experienced attorneys, reviewed trial strategy books and reviewed expert testimony in preparation for Defendant's Trial. She also testified as to her involvement/handling of child witnesses in other cases.

The Court concludes that it was reasonable for defense counsel to waive an opening statement. Since the Defendant did not testify, it would seem odd to give an opening statement, then rest and immediately proceed with closing arguments. Furthermore, it was reasonable for defense counsel not to question the minor victim. There are certainly pros and cons to consider when cross examining a young witness. Defense counsel's explanations for her actions were logical and reasonable. Defendant has failed to overcome the presumption that his attorney's actions constituted sound trial strategy.

Defendant also argues that his counsel violated the Rules of Professional Conduct, disclosed confidences and exhibited hostility toward him. At the hearing there was conflicting testimony from the Assistant Prosecuting Attorney and Defense Attorney. They had different views about the discussions/events that took place off the record throughout this case. It is unfortunate, but clear to this Court, that there was animosity and a lack of respect between the attorneys that tried the case. Given the testimony from defense counsel, the handling of matters outside of the Court lacked professionalism at times. However, the Court does not find that such actions rise to the level of ineffective assistance of counsel, or that defense counsels [sic] actions fell below an objective standard of reasonableness under prevailing professional norms.

Furthermore, given the evidence presented at trial, Defendant has not established a reasonable probability that the outcome of the Trial would have been different in the absence of defense counsels [sic] actions.

This appeal followed, alleging ineffective assistance of counsel because of two perceived errors: counsel's disclosure of client confidences and her failure to cross-examine the child victim.

## II. STANDARDS OF REVIEW

Claims of ineffective assistance present a mixed issue of fact and constitutional law, and the trial court must first determine the facts and then decide whether those facts demonstrate a violation of the defendant's constitutional right to the assistance of counsel. *People v Lewis (On Remand)*, 287 Mich App 356, 364; 788 NW2d 461 (2010). "When a defendant asserts that his assigned lawyer is not adequate or diligent . . . the judge should hear his claim and, if there is a factual dispute, take testimony and state his findings and conclusion." *People v Ginther*, 390 Mich 436, 441-442; 212 NW2d 922 (1973).

We review the trial court's factual findings for clear error and review de novo its ultimate determination. *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008). "Clear error exists if the reviewing court is left with a definite and firm conviction that a mistake has been made." *People v Miller*, 482 Mich 540, 544; 759 NW2d 850 (2008) (quotation marks and citation omitted). In reviewing the trial court's determination, this Court must keep in mind "the special opportunity" of the trial court to judge the credibility of the witnesses who appeared before it. MCR 2.613(C); *People v Sexton (After Remand)*, 461 Mich 746, 752; 609 NW2d 822 (2000). The trial judge's resolution of a factual issue where there is conflicting testimony is entitled to deference. *People v Farrow*, 461 Mich 202, 209; 600 NW2d 634 (1999).

### III. ASSISTANCE OF COUNSEL—*CRONIC*

#### A. OVERVIEW

I disagree with the majority's assertion that defendant was completely denied the assistance of counsel under *Cronic*. In my view, the majority improperly applies the presumption of prejudice based on defense counsel's actions at trial because, when viewing the record as a whole, it cannot be said that defense counsel "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing." *Cronic*, 466 US at 659. In reality, the facts of this case warrant review under *Strickland*, the case under which, as the majority notes, " '[m]ost claims of ineffective assistance of counsel are analyzed,' " and not under *Cronic*. Specific instances of counsel's performance are at issue here, not the whole adversarial process. Although the majority pays lip service to the fact that courts will rarely presume prejudice under *Cronic*, the majority ignores relevant case law and inflates its authority to support its contention that *Cronic* applies.

#### B. *CRONIC* AND ITS PROGENY

In *Cronic*, the defendant was indicted on several counts of mail fraud relating to the transfer of over $9.4 million in checks between numerous banks. *Cronic*, 466 US at 649. After the defendant's retained counsel withdrew, the trial court appointed an inexperienced and young real estate lawyer as defense counsel. *Id.* Counsel was only permitted 25 days to prepare for the trial despite the fact that the government had over $4^{1}/_{2}$ years to investigate the case and had obtained and reviewed thousands of documents. *Id.* During trial, counsel put on no defense but did cross-examine the government's witnesses. *Id.* at 651. On appeal, the United States Court of Appeals for the Tenth Circuit

reversed the conviction because it "inferred" defendant's constitutional right to the effective assistance of counsel had been violated. *Id.* at 652. The "inference" was based on "(1) [t]he time afforded for investigation and preparation; (2) the experience of counsel; (3) the gravity of the charge; (4) the complexity of possible defenses; and (5) the accessibility of witnesses to counsel." *Id.* at 652 (quotation marks and citations omitted).

The Supreme Court of the United States rejected this "inferential" approach, holding that only in the circumstances that no *actual* assistance has been provided has there been a constitutional violation. *Id.* at 654 ("If no actual 'Assistance' 'for' the accused's 'defence' is provided, then the constitutional guarantee has been violated."). The Supreme Court identified three circumstances in *Cronic*, 466 US at 659-660, where prejudice would be presumed because of the lack of actual assistance:

> Most obvious, of course, is the complete denial of counsel. The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial. Similarly, if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable. No specific showing of prejudice was required in *Davis* v. *Alaska*, 415 U.S. [308, 318; 94 S Ct 1105; 39 L Ed 2d 347] (1974), because the petitioner had been denied the right of effective cross-examination which would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it.[26]

> Circumstances of that magnitude may be present on some occasions when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial.

[26] Apart from circumstances of that magnitude, however, there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt.

[Quotation marks and citations omitted.]

The Supreme Court mandated that the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer. *Id.* at 657. If counsel is a reasonably effective advocate, he meets constitutional standards irrespective of his client's evaluation of his performance. *Id.* at 657 n 21, citing *Jones v Barnes*, 463 US 745; 103 S Ct 3308; 77 L Ed 2d 987 (1983) and *Morris v Slappy*, 461 US 1; 103 S Ct 1610; 75 L Ed 2d 610 (1983). Pursuant to *Cronic*, circumstances must indicate that it is unlikely that a defendant *could* have received effective assistance, not whether a defendant *did* receive effective assistance, the latter of which is evaluated under *Strickland. Cronic*, 466 US at 660-661.

The majority relies on the second exception in *Cronic*, 466 US at 659, to overturn defendant's conviction: "[I]f counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." The majority then examines specific instances in the trial to determine that, in its opinion, counsel failed to "meaningfully test" the prosecution's case.[1] The majority misunderstands the law.

In *Bell v Cone*, 535 US 685, 696-697; 122 S Ct 1843; 152

---

[1] The majority argues that counsel failed to provide *meaningful* adversarial testing without defining what *meaningful* means by reference to any case law. Rather than relying on the law, the majority bases its decision on its own feelings regarding what is and what is not meaningful.

L Ed 2d 914 (2002), the Supreme Court examined this second exception of *Cronic* and the meaning of the failure to subject the prosecution's case to meaningful adversarial testing:

> When we spoke in *Cronic* of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, *we indicated that the attorney's failure must be complete.* We said "if counsel *entirely* fails to subject the prosecution's case to meaningful adversarial testing." *Cronic,* [466 US] at 659 (emphasis added). Here, respondent's argument is not that his counsel failed to oppose the prosecution throughout the sentencing proceeding as a whole, but that his counsel failed to do so at specific points. For purposes of distinguishing between the rule of *Strickland* and that of *Cronic,* this difference is not of degree but of kind. [First emphasis added.]

The Supreme Court concluded in *Bell* that the defendant's allegations regarding the defense counsel's failure to present mitigating evidence and make a closing argument did not amount to a complete failure to test the prosecution's case and were the kind of allegations to be addressed by the *Strickland* test and not by *Cronic. Id.* at 697-698 (stating that counsel's errors "are plainly of the same ilk as other specific attorney errors we have held subject to *Strickland's* performance and prejudice components").

Similarly, in *Florida v Nixon,* 543 US 175, 178; 125 S Ct 551; 160 L Ed 2d 565 (2004), the United States Supreme Court held that prejudice should not be presumed under *Cronic* when at the guilt phase of a capital trial the defense counsel conceded that the defendant committed murder, without the defendant's express approval, in order to establish a reason for sparing the defendant's life at the penalty phase. The Florida Supreme Court ultimately held that *Cronic* applied and prejudice should be presumed because the defense counsel failed to obtain the defendant's express ap-

proval for the admission of guilt. *Id.* at 186. The Florida Supreme Court reasoned that the admission of guilt without the defendant's approval at the guilt phase was analogous to entering a plea of guilty without the defendant's approval. *Id.* at 185. The United States Supreme Court disagreed and concluded that the defense counsel's strategy at the guilt phase could not be divorced from his strategy at the penalty phase in a capital case; it held that the defense counsel's strategy did not amount to a complete failure to test the prosecution's case. *Id.* at 190-191. It clarified that the *Cronic* test is to be applied in very narrow circumstances:

> *Cronic* recognized a narrow exception to *Strickland*'s holding that a defendant who asserts ineffective assistance of counsel must demonstrate not only that his attorney's performance was deficient, but also that the deficiency prejudiced the defense. *Cronic* instructed that a presumption of prejudice would be in order in "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." 466 U. S., at 658. The Court elaborated: "[I]f counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *Id.*, at 659; see *Bell* v. *Cone*, 535 U. S. at 685, 696-697 (2002) (for *Cronic*'s presumed prejudice standard to apply, counsel's "failure must be complete"). We illustrated just how infrequently the "surrounding circumstances [will] justify a presumption of ineffectiveness" in *Cronic* itself. In that case, we reversed a Court of Appeals ruling that ranked as prejudicially inadequate the performance of an inexperienced, underprepared attorney in a complex mail fraud trial. 466 U. S., at 662, 666. [*Nixon*, 543 US at 190.]

Thus, the United States Supreme Court held in *Nixon* that whether the defense counsel was ineffective must be analyzed under the performance and prejudice inquiries set out in *Strickland*. *Id.* at 178, 192.

In *People v Frazier*, 478 Mich 231, 244-245; 733 NW2d 713 (2007), our own Supreme Court clarified how to apply the *Cronic/Strickland* standards to cases within our jurisdiction: "[T]he *Cronic* test applies when the attorney's failure is *complete*, while the *Strickland* test applies when counsel failed at specific points of the proceeding."[2] In *Frazier*, our Supreme Court refused to apply *Cronic* and presume prejudice when the defense counsel advised the defendant to waive his right to counsel at the police interrogation and failed to attend the interrogation with the defendant. *Id.* at 244-245. Our Supreme Court held that "[b]ecause counsel consulted with defendant, gave him advice, and did nothing contrary to defendant's wishes, counsel's alleged failure was not complete." *Id.*

---

[2] The procedural history of *Frazier* is complex. *Frazier*, 478 Mich at 234. The Michigan courts initially affirmed the defendant's convictions. *Id.* On habeas corpus review, the United States District Court for the Eastern District of Michigan ordered the defendant to be released unless he was granted a new trial. *Id.* The federal district court found that under *Cronic* the defendant was totally deprived of the assistance of counsel at a critical stage of the proceedings, an interrogation, and, as a result, the defendant's confession during the interrogation should have been excluded. *Id.* at 237-238. During pretrial hearings for the new trial, the trial court suppressed the testimony of two witnesses whose identity was obtained during the interrogation at which counsel was absent. *Id.* at 238. Following an interlocutory appeal by the prosecution, this Court adopted the reasoning of the federal district court in the habeas proceeding and concluded that, as a result of *Cronic*, the testimony of the witnesses must be suppressed because the witnesses' identities were obtained when the defendant was totally deprived of counsel. *People v Frazier*, 270 Mich App 172, 179; 715 NW2d 341 (2006), rev'd and vacated in *Frazier*, 478 Mich at 256. The Michigan Supreme Court specifically rejected the reasoning of the federal district court applying *Cronic* and vacated this Court's underlying published opinion that approved of the reasoning of the federal district court and the application of *Cronic*. *Frazier*, 478 Mich at 246. In doing so, the Supreme Court recognized that the federal district court's decision excluding the defendant's confession was binding with regard to *Frazier*, but it ensured that the federal district court's analysis utilizing *Cronic* was not binding in future cases. *Id.*

In contrast, in *Rickman v Bell*, 131 F3d 1150, 1157, 1160 (CA 6, 1997) the United States Court of Appeals for the Sixth Circuit concluded that there was a *Cronic* violation as a result of a failure to meaningfully test the prosecution's case when the defense counsel "combined a total failure to actively advocate his client's cause with repeated expressions of contempt for his client for his alleged actions" to the jury. The Sixth Circuit noted that the defense counsel called the defendant "nuts" or "just . . . out of somebody's insane asylum" and "wished to portray [the defendant] as vicious and abnormal." *Id.* at 1159-1160. Similarly, the United States Court of Appeals for the Fifth Circuit concluded that a *Cronic* violation occurred and prejudice should be presumed in a case in which the defense counsel slept through substantial portions of the trial. *Burdine v Johnson*, 262 F3d 336, 349 (CA 5, 2001). While this Court is not bound by the decisions of the lower federal courts, *People v Gillam*, 479 Mich 253, 261; 734 NW2d 585 (2007), and while I do not necessarily agree with their reasoning and conclusions, at least it can be said that these cases, unlike the present case, reflect rather extreme circumstances that may warrant the potential applicability of *Cronic*.

### C. APPLICATION OF THE *CRONIC* TEST

The majority claims that the totality of defense counsel's conduct at trial was completely deficient, effectively depriving him of counsel in violation of the Sixth Amendment. As a result, the majority asserts, defendant's claim of ineffective assistance of counsel falls under the analytical framework of *Cronic*, 466 US at 658-659, which does not require a defendant to show prejudice, as contrasted with *Strickland*, 466 US at 687, 694, which requires a defendant to make a showing of

"how specific errors of counsel undermined the reliability of the finding of guilt." *Cronic*, 466 US at 659 n 26, citing *Strickland*, 466 US at 693-696. I disagree. The majority's reasoning is flawed because it utilizes the same analysis specifically *rejected* in *Bell*. *Bell*, 535 US at 697 (finding erroneous the argument that prejudice should be presumed under *Cronic* as a result of counsel's failure "at specific points" rather than "throughout the . . . proceeding as a whole"). *Cronic*—decided the same day as *Strickland*—does not represent a separate standard; rather, it provides an explanation of specific circumstances that are "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Cronic*, 466 US at 658. The presumed prejudice in *Cronic* is based on the premise that the attorney's failure to "subject the prosecution's case to meaningful adversarial testing" was *complete*. *Bell*, 535 US at 697. I see no evidence of that occurring here.

The record indicates that defense counsel adequately ensured the reliability of the adversarial process. Counsel met with defendant before trial on numerous occasions to discuss trial strategy and other pretrial issues. She successfully moved for a forensic examination and a competency hearing. Defense counsel consulted with other attorneys, both before and during trial, and reviewed prior testimony of the prosecution's expert. She successfully obtained a plea deal for defendant. She engaged in voir dire and excused potential jurors from the jury. She conducted cross-examination, made objections and was successful in moving the trial court to provide a cautionary instruction. She utilized inconsistencies in the testimony and the prosecution's expert witness to argue to the jury that the victim should not be believed. Clearly, assistance of counsel was provided

and defense counsel's alleged failures were not "complete"; the majority simply quibbles with its effectiveness.

Indeed, the majority's discussion of the facts in this case indicates that *Cronic* does not apply and prejudice should not be presumed. In summarizing the record, the majority highlights specific examples of where it claims counsel failed to test the prosecution's case. The majority appears most troubled by counsel's waiver of an opening statement; her refusal to cross-examine the child victim, the physical education instructor, and the victim's grandmother; and her failure to present any witnesses on defendant's behalf.[3] The majority highlights these potential deficiencies but does not argue that they were erroneous. At the same time, the majority also indicates areas where counsel did test the prosecution's case. It notes that she cross-examined the victim's mother, Detective Christina Ellis, and expert Connie Black-Pond, and she objected during Detective Ellis's testimony. While the majority questions the efficacy of counsel's cross-examination of all three witnesses, the fact that the majority discusses how effective, or ineffective, she was in her cross-examination demonstrates that *Strickland*, not *Cronic*, should apply to the facts of the case. The majority further remarks that counsel gave a closing statement. It characterizes her closing argument as "the feeblest of defenses imaginable under the circumstances," but, in doing so, recognizes that she provided a defense.

The majority also fails to understand that attorneys representing criminal defendants can face daunting challenges in devising ethically appropriate trial strategies, not the least of which is what to do when a

---

[3] Notably, with the exception of cross-examining the child witness, even defendant does not complain of any of these actions by defense counsel.

defendant's guilt is often clear. This is particularly true when a defendant invokes his right not to testify, thereby precluding the jury from hearing a denial of the charges. As our Supreme Court held in *People v Mitchell*, 454 Mich 145; 560 NW2d 600 (1997):

> "[T]he Sixth Amendment does not require that counsel do what is impossible or unethical. If there is no bona fide defense to the charge, counsel cannot create one and may disserve the interests of his client by attempting a useless charade." [*Id.* at 164, quoting *Cronic*, 466 US at 656 n 19.]

While the majority criticizes counsel's use of the feeblest defense possible, it makes no suggestion as to what other possible theory this case could have been successfully defended on. From the review of the record it is clear that the only bona fide jury issue open to counsel was to argue that the inconsistencies of the testimony and the untrustworthiness of the victim should fail to convince the jury of defendant's guilt beyond a reasonable doubt. Effective assistance of counsel is not the equivalent of successful assistance. *People v Tranchida*, 131 Mich App 446, 449; 346 NW2d 338 (1984).

Finally, I find particularly troubling the majority's holding:

> As Justice Stevens once noted, the failure to offer any meaningful adversarial testing makes a prejudice analysis difficult: "a proper *Strickland* inquiry is difficult, if not impossible, to conduct when counsel has completely abdicated his role as advocate, because the abdication results in an incomplete trial record from which a court cannot properly evaluate whether a defendant has or has not suffered prejudice from the attorney's conduct." *Bell*, 535 US at 718 (Stevens, J., dissenting). This is a case in point.

What the majority fails or refuses to recognize is that Justice Stevens's point of view was specifically *rejected* by the eight other justices of the United States Su-

preme Court. *Id.* at 687. Rather than feeling bound by United States Supreme Court precedent, the majority adopts the reasoning in the dissent in *Bell* to gauge when a *Cronic* violation has occurred. However, statements in a minority opinion are insufficient to undermine the validity of a majority's holding. It is difficult for me to understand how a Michigan intermediate appellate court panel can ignore the 2002 United States Supreme Court's decision in *Bell* limiting *Cronic*'s application and instead apply *Cronic* more broadly when specific instances of potential error are at issue. *Cronic* and *Bell* are binding on all states in this nation and that includes Michigan. But even if the majority finds that it may simply disregard the United States Supreme Court, it *is* bound by the decision of our Supreme Court in *Frazier*.

### IV. INEFFECTIVE ASSISTANCE OF COUNSEL—*STRICKLAND*

#### A. OVERVIEW

Since counsel's failure to test the prosecution's case was not complete, this case should be analyzed under the ineffective assistance of counsel test from *Strickland*. In this case, defendant only makes two specific allegations of error with regard to his claim of ineffective assistance of counsel: (1) counsel violated client confidentiality and (2) counsel failed to cross-examine the victim. Neither claim supports his assertion of ineffective assistance of counsel.

The right to effective counsel is guaranteed by the United States and Michigan Constitutions. US Const, Am VI; Const 1963, art 1, § 20; *Strickland*, 466 US 686. To establish ineffective assistance of counsel, a defendant must show that (1) counsel's performance was below an objective standard of reasonableness under prevailing

professional norms, (2) there is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different, and (3) the resultant proceedings were fundamentally unfair or unreliable. *People v Toma*, 462 Mich 281, 302; 613 NW2d 694 (2000); *People v Pickens*, 446 Mich 298, 309, 312-313; 521 NW2d 797 (1994). Thus, unlike *Cronic*, the *Strickland* test addresses specific errors made by counsel, requiring defendant to show that not only was counsel's performance deficient but also that the defective performance was prejudicial. *Strickland*, 466 US at 686; *Mitchell*, 454 Mich at 157-158.

Effective assistance of counsel is presumed, and defendant bears a heavy burden of proving otherwise. *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999). Defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy. *People v Riley (After Remand)*, 468 Mich 135, 140; 659 NW2d 611 (2003). Decisions as to when to make an opening statement, what evidence to present, whether to call or question witnesses, and on what to focus in closing argument are presumed to be matters of trial strategy, *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212 (2008); *People v Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004), and declining to raise objections to procedures, evidence, or argument can also be sound trial strategy, *People v Unger*, 278 Mich App 210, 242, 253; 749 NW2d 272 (2008). "This Court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight." *People v Garza*, 246 Mich App 251, 255; 631 NW2d 764 (2001).

### B. APPLICATION OF *STRICKLAND*

I disagree with the majority's conclusion that counsel's performance "necessarily fell below an objective

standard of reasonableness under prevailing professional norms." Under *Strickland,* defendant was not denied the effective assistance of counsel.

### 1. CREDIBILITY DETERMINATIONS

Before discussing the alleged errors committed by counsel, I must note my strong disagreement with the majority's credibility determinations. The majority oversteps its review function and, in effect, makes independent findings, substituting its judgment for that of the trial court when it refuses to defer to the trial court's assessment of the credibility of witnesses and makes new credibility determinations to support its conclusion that defendant was totally denied the assistance of counsel. It also completely ignores the standard of review: the trial court first determines the facts and decides whether there is a violation of constitutional magnitude, *Lewis,* 287 Mich App at 364, and then we review, not substitute, the factual findings for clear error and the trial court's ultimate determination de novo, *Petri,* 279 Mich App at 410. Despite the majority's wishes to the contrary, the fact remains that it was *this* trial court that sat through the trial and evidentiary hearing. It was *this* trial court, and not the majority, that observed the demeanor of witnesses and the conduct of counsel. Our Supreme Court stated:

> Resolution of facts about which there is conflicting testimony is a decision to be made initially by the trial court. The trial judge's resolution of a factual issue is entitled to deference. This is particularly true where a factual issue involves the credibility of the witnesses whose testimony is in conflict. [*Farrow,* 461 Mich at 209, quoting *People v Burrell,* 417 Mich 439, 448-449; 339 NW2d 403 (1983).]

A trial court's findings of fact are sufficient if it appears from the record that the trial court was aware of the

issues and correctly applied the law. *People v Smith*, 211 Mich App 233, 235; 535 NW2d 248 (1995).

In this case, after presiding over the jury trial and the hearing on the motion for a new trial, the trial court made a number of findings with regard to whether counsel's assistance was ineffective. The trial court found that counsel "spoke with three other experienced attorneys, reviewed trial strategy books and reviewed expert testimony in preparation for Defendant's Trial." Moreover, the trial court noted her past "involvement/handling of child witnesses in other cases." It further reasoned:

> The Court concludes that it was reasonable for defense counsel to waive an opening statement. Since the Defendant did not testify, it would seem odd to give an opening statement, then rest and immediately proceed with closing arguments. Furthermore, it was reasonable for defense counsel not to question the minor victim. There are certainly pros and cons to consider when cross examining a young witness. Defense counsel's explanations for her actions were logical and reasonable. Defendant has failed to overcome the presumption that his attorney's actions constituted sound trial strategy.

The trial court recognized the "conflicting testimony from the Assistant Prosecuting Attorney and Defense Attorney," noting "[t]hey had different views about the discussions/events that took place off the record throughout this case" and "there was animosity and a lack of respect between the attorneys that tried the case." Still, the trial court concluded that counsel's actions did not "rise to the level of ineffective assistance of counsel," and it could not find that "counsel's actions fell below an objective standard of reasonableness under prevailing professional norms."

Despite these findings of fact, the majority completely ignores the unique position of the trial judge,

who is not only experienced but is also the Chief Judge Pro Tem of the Ninth Circuit Court, and disregards the trial judge's credibility findings. In fact, the majority asserts that the trial court "decline[d] to resolve the credibility dispute between [the assistant prosecuting attorney and defense counsel]." I disagree. The trial court clearly found counsel's testimony more credible than the assistant prosecuting attorney's testimony because, despite the assistant prosecuting attorney's allegations that counsel told her that defendant "made her sick" and counsel "couldn't look at him," the trial court found counsel's performance was not deficient. Without having been at the trial or having witnessed the testimony of the assistant prosecuting attorney and counsel in person, the majority concludes that the assistant prosecuting attorney is more "credible" than counsel, even though the trial judge found just the opposite. The majority even characterizes counsel's testimony as "impish and contrived" without having watched the trial or seen her testify in person. I find it hard to believe that the majority could make such a credibility determination based on the transcript alone, and I cannot go along with the majority's refusal to defer to the clear credibility determinations of the trial court.

Moreover, the majority's faith in the credibility and the motives of the assistant prosecuting attorney is misplaced. The majority finds it "particularly noteworthy" and "an act of courage" that the assistant prosecuting attorney decided to report counsel for the inadequacy of her representation. The majority writes, "Prosecutors are not known for challenging the fairness of the trials they prosecute, and the fact that [the assistant prosecuting attorney] did so is . . . compelling evidence that defendant did not receive proper representation at trial." I adamantly disagree. A prosecutor

"has the responsibility of a minister of justice" and has an ethical obligation to ensure that "the defendant is accorded procedural justice . . . ." Comment to MRPC 3.8. If the assistant prosecuting attorney felt that counsel's representation was so deficient, she had an ethical obligation to bring her beliefs to the trial court's attention *before* defendant was convicted and sentenced. Instead, the assistant prosecuting attorney only raised the issue *after* defendant was convicted and sentenced. The assistant prosecuting attorney's failure to raise the issue in a timely manner amounts to an ethical violation and reflects her own misfeasance rather than any evidence that counsel's assistance was ineffective. I also note that the assistant prosecuting attorney's report regarding counsel's supposedly ineffective representation of defendant was apparently not made to the Attorney Grievance Commission, but rather to the court administrator; a move clearly designed to affect future assignments rather than any "concern" over competency. Moreover, the assistant prosecuting attorney's "concerns" and defendant's motion for a new trial were vigorously opposed by the Office of the Prosecutor. As a result, the assistant prosecuting attorney's claims were not recognized as legitimate even by the Office of the Prosecutor or the trial court. They should not be given any legitimacy here. The letter to the court administrator merely consisted of the assistant prosecuting attorney's own feelings on the matter. She was determined to take a particularly vindictive approach to the issue; otherwise, as a prosecutor bound by our rules of professional conduct, she would have certainly brought it to the attention of the trial court *during* trial. The question whether an attorney has rendered effective assistance has never been one to be decided by plebiscite; we should not start now.

### 2. CROSS-EXAMINATION OF CHILD VICTIM

The majority concludes that counsel was ineffective for failing to cross-examine the victim since counsel expressed a belief that the victim was telling the truth and "for that reason, did not deserve to be put through a cross-examination on behalf of her guilty client." The trial court concluded that counsel's decision was reasonable, and I agree. Counsel testified that the victim expanded her testimony slightly during direct examination and that she believed the new testimony could have supported a charge of first-degree criminal sexual conduct. Counsel was concerned that cross-examination would highlight this new information and that the assistant prosecuting attorney, as a result, would amend the felony information to include a new charge. A trial court may amend the information at any time before, during or after trial. MCL 767.76. Counsel also indicated that the jury looked shocked during the victim's direct examination and she did not want to be perceived as bullying the then 11-year-old victim. As the trial court noted, "[t]here are certainly pros and cons to consider when cross examining a young witness," and it found counsel's explanation to be reasonable and logical. The trial court's finding was not clearly erroneous. Decisions regarding the questioning of witnesses should not be second-guessed on appeal. *Horn*, 279 Mich App at 39. Moreover, no two attorneys will ever try a particular case in the exact same way. And this Court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight. *People v Matuszak*, 263 Mich App 42, 58; 687 NW2d 342 (2004). Defendant has not overcome the strong presumption that counsel's decision was based on sound trial strategy.

3. CONFIDENTIAL COMMUNICATIONS AND PERSONAL ANIMUS

The majority concludes that it cannot determine whether defense counsel was ineffective based on, as defendant alleges, her disclosure of confidential communications to the prosecuting attorney and her personal animus towards defendant. I disagree. With regard to these claims, the testimony at the motion hearing was conflicting. The assistant prosecuting attorney testified that counsel told her that defendant committed the crimes, while counsel denied making such a statement and testified that she only told the assistant prosecuting attorney of the same admissions defendant had made in the police report. The assistant prosecuting attorney further testified that counsel told her that defendant "made her sick," while counsel testified that she advocated vigorously for defendant and was not pleased that he was convicted. Counsel also denied giving the assistant prosecuting attorney a "thumbs-up" and stating that defendant was "toast" after defendant had been sentenced. Counsel testified that the assistant prosecuting attorney was condescending throughout the case. Counsel admitted to being "snotty" and flippant in return and that, in her view, the assistant prosecuting attorney had taken some of her sarcastic remarks as true. After considering these testimonies, the trial court resolved the conflicting version of events in counsel's favor.

The trial court's finding was not clearly erroneous. As noted above, the trial court is in a better position to judge the credibility of the witnesses, and we will not displace its findings in this regard on appeal, absent some clear error. *Sexton*, 461 Mich at 752; *Petri*, 279 Mich App at 410. The trial court acknowledged the attorneys' conflicting views of the events and found that "there was animosity and a lack of respect between

the attorneys . . . [and that] the handling of matters outside of the Court lacked professionalism . . . ." Given the character of the attorneys' relationship, the trial court found counsel's testimony more believable and found that her performance was not deficient. Nothing in the record testimony leaves me with a definite and firm conviction that this finding was wrong. Accordingly, just as the trial court concluded, I conclude that counsel's performance did not fall below an objective standard of reasonableness under prevailing professional norms.

### 4. PHYSICAL EDUCATION TEACHER'S TESTIMONY

The majority also criticizes counsel for not cross-examining the gym teacher, although defendant does not raise this as an element of ineffective assistance.[4] I can only note that the teacher's testimony was contained on barely 2½ pages of the trial transcript. The question asked by the prosecutor was simple: "Can you tell us what happened?" I am unclear as to what possible objection could have been made to this question. While the teacher's response is troublesome, it is a simple fact of life in the trial courts that there are some witnesses who will blurt out inappropriate comments. See *People v Gonzales*, 193 Mich App 263, 265; 483 NW2d 458 (1992). And, "there are times when it is better not to object and draw attention to an improper comment." *People v Bahoda*, 448 Mich 261, 287 n 54; 531 NW2d 659 (1995). The majority creates this "failing" out of whole cloth.

---

[4] This Court usually does not address issues not raised in the parties' briefs. *People v Byrne*, 199 Mich App 674, 677; 502 NW2d 386 (1993). As a result, it was improper for the majority to address this issue, which was not even mentioned in the parties' briefs.

### 5. DEFENDANT'S MENTAL LIMITATIONS

The majority also complains that counsel did not bring forward evidence about defendant's mental limitations. Again, this issue is not even raised by defendant. Moreover, it has no support in the record.

Within a week of defense counsel's appointment, she successfully moved for a forensic examination and a competency hearing and met with defendant's mental health providers. At the examination, defendant was "eager to present himself as disabled," with a low IQ and an inability to spell or read, and seemed angry about being charged with the criminal offenses because it "was too long ago!" But, as noted by the examiner, defendant's claims were belied by the examination. Defendant was able to read out loud portions of the documents he brought with him to the examination, and

> defendant was able to fill out the personal history questionnaire and sign his name providing information about his current address, age, date of birth, number of children, education, etc. He was well able to track the conversation and was very well aware of nonverbal nuances indicating a keen awareness of the forensic process. Moreover, it appeared that the defendant preferred to manipulate this process as noted above. The defendant also appeared to prefer to present himself as one who has less ability to remember than he does truly. For example, he would often state, "I don't know", or "I can't remember," "I'm mentally retarded," and then contradict these statements by providing other details (i.e., about his biker club, Hell's Angels" [sic], his work history," "his knowledge about his past IQ testing) that required a more complex level of memory or associative skills.

When he discussed the charges against him, defendant believed that even if the victim were to testify, she would not want him to go to jail, and he blamed his

sister, the victim's mother, for the charges. He also noted that there were no witnesses to the assaults. Finally, he discussed plea bargaining and stated that he would not accept any plea that required him to register as a sex offender. Had counsel tried to introduce defendant's supposed mental limitations, it would have been subject to serious impeachment. Even defendant does not set forth this as a claim on appeal for obvious reasons given the content of the forensic report. The majority's suggestion that failure to explore defendant's mental health limitations is an error committed by counsel ignores the reality that such evidence is unfavorable.

### V. CONCLUSION

In sum, defendant has not shown that the trial court clearly erred by finding that counsel's performance was not deficient. And, after reviewing the record, I cannot conclude otherwise. Because counsel was not deficient, no prejudice resulted. Even if there were errors at trial, the evidence against defendant was overwhelming. Accordingly, the trial court did not err by finding that defendant was not denied the effective assistance of counsel and by denying defendant's motion for a new trial.

I also question how the majority's opinion is now to be applied to future cases. Taken as a whole, it places a burden on the appellate courts of this state to review de novo every claim of ineffective assistance of counsel. I have little faith in the ability of an appellate court, especially in cases where credibility is at issue and the record is cold, to substitute its judgment for that of the trial court judge who actually sat through a trial and conducted the requisite evidentiary hearing. In effect, the majority's position simply permits random refer-

enda on an attorney's overall performance based on what a given Court of Appeals panel believes is "meaningful" while ignoring the duty to actually analyze any given case pursuant to the law. Under this opinion, and keeping in mind that *Cronic* refers to the *kind* of violation and not the *degree* of violation, we now have a *Cronic* violation any time a witness blurts out an unresponsive answer or any time counsel reserves an opening argument, does not cross-examine a child victim of sexual assault, fails to voir dire a previously certified expert witness, or refuses to put into evidence damaging mental health testimony. A *Cronic* violation will also arise whenever an attorney argues in closing trial-testimony inconsistencies or that a victim is not worthy of belief. Application of this new rule of law will result in inconsistent outcomes in every case. The rule of law should not depend on the idiosyncrasies of a particular Court of Appeals panel. As Justice Scalia recently wrote in his dissent in *Michigan v Bryant*, 562 US ___, ___; 131 S Ct 1143, 1176; 179 L Ed 2d 93 (2011):

> Judicial decisions, like the Constitution itself, are nothing more than "parchment barriers." Both depend on a judicial culture that understands its constitutionally assigned role . . . and has the modesty to persist when it produces results that go against the judges' policy preferences. Today's opinion falls far short of living up to that obligation—short on the facts, and short on the law. [Citation omitted.]

The trial court did not err in denying defendant's motion for a new trial. I would affirm.